Nichols, Senior Circuit Judge, submitted additional view.

See also 529 F.Supp. 664, 529 F.Supp. 670.

**MATSUSHITA ELECTRIC INDUSTRIAL CO., LTD.,
et al.,* Appellees,**

**v.**

**The UNITED STATES and Zenith Radio Corporation, Appellants.**

**Appeal Nos. 84–693, 84–694.**

United States Court of Appeals, Federal Circuit.

Dec. 13, 1984.

---

\* The names of the appellees are listed in the appendix to this opinion. An *amicus curiae* brief was accepted on behalf of the Committee to Preserve American Color Television (a.k.a. COMPACT), the Independent Radionic Workers of America, the International Brotherhood of Electrical Workers, and the International Union of Electronic, Electrical, Technical, Salaried and Machine Workers, AFL–CIO–CLC.

Jane K. Albrecht, Office of Gen. Counsel, U.S. International Trade Commission, Washington, D.C., argued for appellant United States. With her on the brief were Michael H. Stein, Gen. Counsel and Michael P. Mabile, Asst. Gen. Counsel, Washington, D.C., for Litigation.

Frederick L. Ikenson, Washington, D.C., argued for appellant Zenith Radio Corp. With him on the brief was J. Eric Nissley, Washington, D.C., of counsel.

Stuart M. Rosen, Weil, Gotshal & Manges and Gail Cumins, Sharretts, Paley, Carter & Blauvelt, P.C., of New York City, argued for appellees.

A. Paul Victor, New York City, and Carmen M. Shepard, Washington, D.C., Weil, Gotshal & Manges, New York City, of counsel.

Ned H. Marshak, Sharretts, Paley, Carter & Blauvelt, P.C., New York City, of counsel.

Paul D. Cullen, Collier, Shannon, Rill & Scott, Washington, D.C., was on the brief for amicus curiae.

Before NIES, Circuit Judge, NICHOLS, Senior Circuit Judge, and NEWMAN, Circuit Judge.

NIES, Circuit Judge.

Upon review under 19 U.S.C. § 1675(b) (Supp. IV 1980), the International Trade Commission (Commission) determined that the U.S. television industry would be threatened with material injury if an existing antidumping order on television receivers from Japan, T.D. 71–76, were to be modified or revoked.[1] The Court of International Trade reversed, holding that the Commission's determination was not supported by substantial evidence.[2] The United States and Zenith Radio Corporation appeal that decision to this court under 28 U.S.C. § 1295(a)(5) (1982). We reverse.

## Background

In 1971, to protect the U.S. television industry from injury by sales of television receivers from Japan at less than fair value (LTFV), an antidumping duty order (T.D. 71–76) was issued imposing the assessment of dumping duties on such imports.[3] Even with the antidumping order in effect, the condition of the U.S. television industry deteriorated. In 1977, the Commission, pursuant to 19 U.S.C. § 2251 (1976), recommended a restriction on the quantity of imports of color television receivers from Japan. The President, acting on that recommendation, implemented an orderly marketing agreement (OMA) with the Japanese. The OMA stayed in effect until May 1980, when it was allowed to expire following the Commission's review and determination, pursuant to 19 U.S.C. § 2253(i) (1980), that a restriction on the quantity of imports was no longer necessary inasmuch as the "imports of Japanese [color] sets no longer pose a serious concern to the domestic industry."[4]

Following the elimination of the OMA restriction, Matsushita Electric Industrial Co., Ltd., and the other appellees of this appeal (collectively "Matsushita"), pursuant to 19 U.S.C. § 1675(b)(1) (Supp. IV

1. *Television Receiving Sets from Japan,* 46 Fed. Reg. 32,702 (1981).

2. Reported at 569 F.Supp. 853 (Ct.Int'l Trade), *reh'g denied,* 573 F.Supp. 122 (1983).

3. 36 Fed.Reg. 4597, 5 Cust.Bull. 151 (1971). The antidumping "order" was technically a dumping "finding" under the predecessor statute in effect in 1971. However, dumping findings and antidumping orders are treated identically for purposes of a Section 751(b) review.

4. *Color Television Receivers and Subassemblies Thereof,* Inv. No. TA–203–6, USITC Pub. No. 1068 at 1 (1980).

1980),[5] petitioned the Commission to review T.D. 71–76, contending that revocation of that order would not be injurious to the U.S. industry for the same reasons that the OMA was no longer necessary. The petitions were opposed by various U.S. interests, including appellant, Zenith Radio Corporation, which argued that circumstances had not changed sufficiently to warrant review. Nevertheless, an investigative review was undertaken pursuant to 19 C.F.R. § 207.45 (1981) (implementing 19 U.S.C. § 1675(b) (Supp. IV 1980)) to determine "whether an industry in the United States would be materially injured, or would be threatened with material injury ... if the antidumping order were to be modified or revoked."[6]

In its review, the Commission compiled relevant data, sent out questionnaires to domestic producers, importers, and purchasers of television receivers, and held two days of hearings during which counsel for all parties and interested members of the public were allowed to testify, present witnesses, present oral argument, question opposing counsel and witnesses, and answer questions from the panel of Commissioners.

On June 4, 1981, the Commission determined by a vote of three to one that the U.S. industry would be threatened with material injury if T.D. 71–76 were to be modified or revoked.

### The Commission's Determination

The Commission began its analysis by noting that the results of the investigation into continuation of the 1977 OMA did not dispose of the issues faced here for three principal reasons:

(1) The two investigations, according to the Commission, are fundamentally differ-ent, an OMA investigation involving, for example, a much more rigorous standard of injury than that in an anti-dumping investigation;

(2) Since the 1980 OMA review was made, imports from Japan had bottomed out and had started to climb again; and *most importantly,*

(3) The 1980 OMA review *assumed the continuation* of T.D. 71–76.

The Commission noted that while the statute sets forth no specific standard for conducting an antidumping review under 19 U.S.C. § 1675(b), the implementing regulation, 19 C.F.R. § 207.45(a), according to the Commission, required it to:

> consider the relevant facts and circumstances as they currently exist, assess the intentions of the exporters and importers as to the prospective revocation or modification of the order, and project those factors into the future, to determine whether an industry in the United States would suffer material injury, or the threat thereof, or whether the establishment of an industry would be materially retarded, as a result of the changed behavior of the exporters and importers upon being freed from the pricing constraints of the order.

The Commission premised its determination on the assumption that LTFV sales *would resume or continue* upon revocation of the antidumping order. This premise was seen to follow from the alternative routes available to a party seeking relief from an outstanding antidumping order. Under 19 C.F.R. § 353.54 (1981), an importer may seek exemption from or revocation of a dumping order through the Commerce Department by showing dumping has ceased (ordinarily for a period of

---

**5.** 19 U.S.C. § 1675(b)(1) (Supp. IV 1980) provides:

(b) Reviews upon information or request.
(1) In general. Whenever ... the Commission receives ... a request for the review of ... an affirmative determination made under section ... 1673d(b) of this title, which shows *changed circumstances* sufficient to warrant a review of such determination, it shall conduct such a review after publishing notice of the review in the Federal Register. [Emphasis added.]

**6.** At the time the investigation was instituted, § 207.45 was under revision. The amended version (quoted above), effective March 23, 1981, was used by the Commission in the investigation.

two years) and, most significantly, by agreeing not to dump in the future. The importers in this case did not utilize this relief provision.[7] Moreover, the importers introduced no direct testimony with respect to how removal of the order would or would not alter their pricing and volume decisions. In the absence of satisfactory evidence with respect to the importers' intentions, the Commission found itself forced to rely on the capabilities of the Japanese producers and on general economic factors to assess their future behavior. Though evidence on Japanese production capacity was also difficult to obtain, the indications, according to the Commission, were that the Japanese had adequate flexibility to supply any market on relatively short notice. Given the strong price competition in the U.S. market, the Commission concluded it had no basis to believe that dumping would not resume or margins increase upon revocation of the order.

The question remained, however, whether dumping would occur to such an extent as to be materially injurious. The Commission then set forth three scenarios which led it to conclude that imports were likely to increase to the material injury of U.S. industry.

First, the Commission noted that its investigation disclosed that the domestic market, despite dramatic change in the past ten years, remained highly competitive with relatively low profitability. The Commission reasoned that, if demand for televisions continued to rise in the United States (as predicted), renewed or increased dumping could keep prices artificially depressed, allowing the Japanese to increase market share for both imports and domestic production through LTFV sales, which had been found to be injurious in 1971.

Second, the Commission reasoned that the Japanese could be expected to use dumped imports to increase their market share for any short-term, cyclical increases in demand, while gradually increasing production capacity of their U.S. subsidiaries to maintain it. The Commission pointed out that the phenomenon appeared to be occurring even with the antidumping order in place, a recent surge in demand for 13-inch televisions having spurred a 400% increase in Japanese imports within a few months' period. According to the Commission, that increase in imports confirmed the supply flexibility available to Japanese companies.

Third, the Commission expressed a concern over a recent softening in demand for Japanese picture tubes, the most expensive component of a television receiver, in other overseas markets. Excess Japanese tube production capacity and lower U.S. duty rates on complete sets, as compared to tubes, were seen as incentives for the production of more sets for the United States market. Further, the possibility of major import restraints in other countries on tubes or sets would, in the absence of an antidumping order, encourage increased imports into the U.S.

Based on the above considerations, the Commission found that the U.S. television industry would be threatened with material injury if T.D. 71–76 were modified or revoked.

### The Decision of the Court of International Trade

Reviewing the threatened injury determination on the administrative record, the Court of International Trade held that there was "no substantial evidence to support the conclusion that the level of importations from Japan would be injurious if the antidumping order were to be revoked."

As an initial matter, the Court agreed with the premise utilized by the Commission that it must be presumed that future

7. At oral argument, appellees contended that, although they had initially pursued this avenue of relief, they were "stuck at the ITA [Commerce] by virtue of its delinquency in not processing the information which had been submitted," and, thus, turned to the ITC for relief under § 1675(b). Sony Corporation, on the other hand, had obtained exemption from T.D. 71–76 in 1975.

imports from Japan would be made at less than fair value. Further, the Court held that substantial evidence supported the Commission's finding that the U.S. industry was still in a delicate state of health.

The Commission's finding that material injury was threatened was improper, the Court concluded, because it was not based on "positive" evidence tending to show an intention by the Japanese to increase levels of importation, but rather on the asserted failure of the Japanese to introduce credible evidence to the contrary. According to the Court, an impermissible presumption was made "that the intention to increase imports (which was temporarily restrained by the existence of an antidumping duty order) remained undiminished." In the Court's view, the Commission, in attempting to honor the basic protective intent of the antidumping law, had erroneously premised its review on the validity of the existing order, thereby presuming injury would recur and improperly placing the burden on the Japanese companies to prove otherwise.

The Court reasoned that the "unavoidable inference" from the "changed circumstances" which triggered a review is that the threat of material injury had dissipated. Moreover, according to the Court, international agreements mandate this approach.[8]

The Court then specifically examined the evidentiary support for the Commission's finding on the Japanese intent to increase imports upon revocation of the antidumping order. An intent to increase, per the Court, could not be derived from a presumption that the antidumping order was restraining such intent, or from the failure of the Japanese to offer evidence of lack of intent, or solely from a disbelief in the

credibility of the "evidence" (e.g., assurances of counsel) offered by the Japanese.

Turning to the record, the Court discounted reliance on evidence of Japanese production capability to support the conclusion that imports would increase following removal of the order. The Commission had not relied on that basis alone, according to the Court, nor had the Commission adequately confronted the irrationality of such behavior, in that increased imports would injure Japanese-owned subsidiaries in the U.S.

The Court then turned to the Commission's scenarios on threatened harm, which rested on a combination of capacity and other economic factors. The first scenario was dismissed because it was no more than a truism that prices would be suppressed *if* import levels were to increase, an assumption the Court had just decided could not be made.

The second scenario was rejected because the Court found it inconsistent with the Commission's previous inclusion of the domestic Japanese subsidiaries in the U.S. market, which according to the Court, was a finding of "no coordination" between Japanese producers in Japan and their U.S. subsidiaries, whereas the second scenario was predicated on such coordination.[9]

The third scenario, relating to the projected surplus of Japanese picture tubes and probable use in sets to increase exportations to the attractive U.S. market, was found by the Court to be based not on verifiable factual predicates, but on "a chain of predictions set on an insubstantial base and … entirely conjectural."

Thus, the Court reversed the Commission's determination of threatened injury if

---

8. On this point, the Court noted that Article 9(a) of the Agreement of Implementation of Article VI of the General Agreement on Tariffs and Trade provides that "an anti-dumping duty shall remain in force only as long as, and to the extent necessary to counteract dumping which is causing injury," the term "injury" being defined in Article 3, n. 1, as "material injury, *threat of material injury* to a domestic industry or material retardation of the establishment of such an industry." (Emphasis added.) As

"threatened injury" is the question here, we find no guidance from the above-quoted provision.

9. The Court had originally rejected this scenario on the basis that an increase in market share by the Japanese-owned subsidiaries in the U.S. would *benefit* U.S. industry of which they were part. On motion for rehearing by the appellant, the Court modified its reasoning to that stated above.

T.D. 71–76 were revoked because the subsidiary findings of fact necessary to support the three injury scenarios were not supported by substantial evidence, and the scenarios did not flow rationally from the findings which were properly supported.

In this appeal, Zenith and the United States urge the correctness of the Commission's analysis and further urge that, in any event, the Court should have remanded for redetermination by the Commission under the standard adopted by the Court, rather than reversing. Matsushita advances the Court's position in all respects.

## OPINION

■ A threshold question posed by the parties is whether, in reviewing determinations of injury or likelihood of injury in antidumping cases, we review the *Court's* decision to determine if it is based on a "fair assessment of the record," as Matsushita contends, or whether we directly review the determination of the *Commission*, as appellants assert.

There is no question but that under our jurisdictional statute it is the Court's decision that is before us. 28 U.S.C. § 1295(a)(5). However, resolution of whether the Court correctly held that the Commission's decision was not supported by substantial evidence requires consideration of the evidence presented to and the analysis by the Commission. Thus, to determine whether the Court correctly applied the statutory standard of 19 U.S.C. § 1516a(b)(1)(B),[10] we must review the Commission's decision. *Atlantic Sugar, Ltd. v. United States*, 744 F.2d 1556, 1559 n. 10 (Fed.Cir.1984); *Armstrong Bros. Tool Co. v. United States*, 626 F.2d 168, 169–70 (CCPA 1980). Only if we agree

with the lower court's conclusion on this initial question would we reach the question whether the court properly disposed of the case by reversal, rather than remand.[11]

### Applicable Standard in a Review Investigation

Matsushita argues that once the Commission accepted that circumstances had changed so drastically from those at the time of the 1971 injury determination to warrant review, the Commission must conduct a review investigation in the same "neutral" manner as an original investigation. Thus, in Matsushita's view, no burden of proof may be imposed on importers to establish that pricing and importing trends would *not* change or, if they did change, that they would *not* injure the domestic industry.

■ As an initial matter, we reject the view that a decision to undertake a review creates an inference that the outstanding order is no longer necessary. A decision to undertake review is a threshold decision which merely sets the review proceedings in motion and has no bearing on the merits. The evidence submitted in support thereof may or may not be persuasive on the issue of revocation.

■ Further, we do not agree that a review investigation begins on a clean slate just as though it were an original investigation to determine whether an antidumping order should be put into effect. The applicable regulation, 19 C.F.R. § 207.45(a), correctly provides that in a review investigation the Commission must be persuaded that an existing order could be *modified* or *revoked* without material injury to the U.S. industry.[12]

---

10. 19 U.S.C. § 1516a(b)(1)(B) provides:
    The court shall hold unlawful any determination, finding, or conclusion found—
        *   · *    *    *    *    *
    (B) in an action brought under paragraph (2) of subsection (a) of this section, to be unsupported by substantial evidence on the record, or otherwise not in accordance with law.
    The Court is required by 28 U.S.C. § 2640(b) to apply that standard.

11. For discussion of an analogous situation concerning appeal from a district court where the trial had been before a master, see *Milliken Research Corp. v. Dan River, Inc.*, 739 F.2d 587, 592–93, 222 USPQ 571, 575–76 (Fed.Cir.1984).

12. We note that the regulations provide that if the vote of the Commission is evenly divided, the outstanding order remains unaffected. 19 C.F.R. § 207.45(a).

Finally, we do not discern that the Commission imposed a "burden of proof" on the Japanese importers to prove no injury was likely to occur. The Commission's decision does not depend on the "weight" of the evidence, but rather on the expert judgment of the Commission based on the evidence of record.[13] On review, the question is whether there was evidence which could reasonably lead to the Commission's conclusion, that is, does the administrative record contain substantial evidence to support it and was it a rational decision?

More specifically, the question here is whether the evidence and reasonable inferences from the record support the finding that the Japanese importers were likely to increase imports upon revocation of the antidumping order.

### Substantial Evidence

As the Supreme Court stated in *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S.Ct. 206, 216, 83 L.Ed. 126 (1938) and reaffirmed in *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 477, 71 S.Ct. 456, 459, 95 L.Ed. 456 (1951): "Substantial evidence is more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Substantial evidence "is something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." *Consolo v. Federal Maritime Comm'n*, 383 U.S. 607, 619–20, 86 S.Ct. 1018, 1026–27, 16 L.Ed.2d 131 (1966); *Armstrong Bros.*, 626 F.2d at 170 n. 3.

■ With the above principles in mind, we turn to the issue of whether substantial evidence supports the Commission's determination.

Matsushita's primary argument is that the Commission determination was not based on "a verifiable factual basis," but

on mere "speculation." As stated in its brief:

> [A]t no point did the Commission find (or show evidence to support a finding) that as a consequence of revocation of the antidumping duty order: Japanese-owned firms *would* supplement their U.S. production with imports from Japan; or that they *would* lower their prices; or that the domestic industry *would be injured* if any of the import or pricing trends, which it hypothesized might occur, in fact occurred. Rather, the Commission's determination consisted of projecting three *hypothetical* sequences of events and concluding that, *if* these scenarios became reality, the domestic industry *could* be threatened with material injury. [Emphasis in original.]

Matsushita appears to ignore the inherently predictive nature of a review investigation. In no case will the Commission ever be able to rely on concrete evidence establishing that, in the future, certain events *will* occur upon revocation of an antidumping order. Rather, the Commission must assess, based on currently available evidence and on logical assumptions and extrapolations flowing from that evidence, the likely effect of revocation of the antidumping order on the behavior of the importers.

With respect to the "direct" evidence on intent, the record fully supports the Commission's disregard of "testimony" by counsel for the importers. Counsel maintained that revocation of the order would not result in lower prices or increased exports to the United States. However, after this testimony was heard by the Commission, and after the Commission was originally scheduled to vote in this investigation, imports of 13-inch sets from Japan increased 400 percent in one quarter, effectively negating counsel's assurances that imports would not increase and counsel's arguments that the decreased volume of imported Japanese television sets was an "irreversible trend" unrelated to the dumping finding. Further, counsel acknowl-

---

**13.** Matsushita does not assert that the Commission's investigation was inadequate.

edged that T.D. 71–76 had had an effect on the volume and pricing decisions of the importers.

Since the importers chose not to provide any direct evidence on their intent, the Commission had no choice but to rely on circumstantial evidence from which to infer likely intent, namely, production capacity, domestic and foreign demand, and incentives or motivations to increase imports. Such factors are always relevant and, indeed, may be more reliable than self-serving declarations.

Here, the Commission found that any of three possible scenarios would harm or threaten harm to the U.S. industry. While we conclude that each scenario has sufficient evidentiary support, we limit our discussion to the third situation, which is sufficient to sustain the determination, and which the government brief treats in detail.

The third scenario relates to an expected excess of television tubes in Japan which the Commission predicted would likely be utilized in additional television sets for the expanding U.S. market. The government brief sets out the following evidentiary base for this scenario:

Mr. Moss, an executive of Corning Glass Works (Corning), brought extensive, detailed knowledge on this issue to the Commission. Taiwan and Korea were in the process of constructing their own facilities for the production of color tubes. *E.g.*, app. 1529, 1591–92. The total planned capacity for these manufacturing facilities was 6.5 million tubes, which represented over a third of Japan's color tube capacity at that time. *E.g.*, app. at 1591. [Ed. note—appears slightly less than one third.] Korea and Taiwan would be filling the needs of their domestic markets and competing "nose-to-nose" with Japan for color tube sales in the export markets. App. at 1575. Mr. Moss testified, on the basis of his research which included meetings with Japanese tube manufacturers, that the Japanese color television tube manufacturers would face serious capacity utilization problems in the immediate future,

"perhaps within a year." [Sic, "perhaps even next year."] App. at 1591. Reaching a certain economy of scale is crucial for tube producers because of the immense capital investment and other fixed costs required for tube production. *E.g.*, App. at 1526, 1530–31, 1574–75. Furthermore, because color television tube production equipment is highly specialized, and because of the great expense of retooling for any other product, a color tube producer will attempt to fill unused capacity before retooling to produce other products. App. at 1583–84. Thus, the Japanese tube producers would be under pressure to seek other markets to fill the unused capacity.

In addition to the imminent contraction of demand in the Far East, the record showed that the European Economic Community was preparing to impose import restraints on Japanese color television sets and tubes. *E.g.*, App. at 1529–30, 1575–80, 2045–46; conf. app. at 3001. At the time of the investigation, the European Economic Community was Japan's largest direct export customer for color tubes, as well as a major market for Japanese color receivers. By the time of the Commission vote, the EEC had already reached a consensus to monitor Japanese imports of televisions and tubes for the purpose of enabling import restraint measures. App. at 2045–46. Several member countries of the EEC had quotas on imported Japanese television sets already in place. Conf. app. at 3001–02. In addition, France had already been authorized by the EEC to limit imports of Japanese color sets entering from third-party countries. *Id.* Serious discussions on import restraints on tubes were already in progress. App. at 1577; conf. app. at 3001–02. Mr. Moss testified that "early next year Japanese exports to Europe will be limited by an agreement similar to an Orderly Marketing Agreement and the Japanese will definitely lose business in the [color television] tube market in Europe." App. at 1530. Corning France was making "hard and fast [current] business de-

cisions involving tremendous amounts of capital based on a very firm conviction that in 1981 Japanese imports to Europe will be cut back very substantially." App. at 1579–1580. Moreover, this did not represent solely the opinion of Corning. Mr. Moss testified:

> These are not just my opinions. They are also the opinions of professional Japanese businessmen involved directly in the tube industry with whom I talked.
>
> The tube manufacturers are pretty concerned about their future. I have even been told that the *Japanese manufacturers expect to be severely limited in Europe, they will have to find an outlet for those tubes, and that outlet would be the United States.*

App. at 1595 (emphasis added).

No evidence on the record contradicted Mr. Moss' testimony on this point. Counsel for the Japanese producers argued that expanding markets in the third world (particularly Saudi Arabia and the Peoples' Republic of China) would compensate for contracting markets in the Far East and Europe. App. at 1648–52, 1713. However, no data as specific and authoritative as Mr. Moss' testimony were submitted in support thereof. In addition, Mr. Sartin of Corning Glass Works indicated that a study conducted by Corning on potential demand for color television receivers in the People's Republic of China indicated that there will be "no appreciable demand" in the PRC for color televisions in the near future. App. at 1670. There were also suggestions that tubes for video games and personal computers would fill some of the capacity lost by reduced sales in Europe, Taiwan and Korea. However, Mr. Moss testified that the projected growth in those markets would not "even come close" to filling the gap left by sales lost to Taiwan and Korea. App. at 1588–90, 1592–94.

The Commission's reliance on Mr. Moss' testimony, in light of his considerable expertise in the area and the lack of any evidence which seriously undermined

it, was eminently reasonable. Moreover, the Commission's conclusion that the United States was a likely target for diversion of the unused capacity was equally reasonable. At the same time that Japan was faced with impending import restraints in Europe and substantial contraction of its tube market in Taiwan and Korea, demand in the United States was growing, thereby making the United States a likely target for diversion of unused Japanese capacity. Exports represent a substantial portion of Japanese production of sets and tubes. Conf. app. at 3001[–02]. Although Japan's exports of televisions had declined in recent years as Japanese producers built facilities here, the record showed that Japan still exported more color television sets to the United States than to any other single country. Conf. app. at 3002[–03]. The United States has traditionally been one of Japan's major export markets for televisions, as well as one of the largest and most open markets in the world. The surge of 13-inch imports in the first quarter of 1981 provided concrete evidence that Japan had retained its long-held interest in this lucrative market. [Footnotes deleted; bracketed material represents corrections.]

We have reviewed the record references and find them to provide solid support for the above statements.

Matsushita counters the above excerpts from the record by pointing to other factors, specifically: that trade restraints were not actually imposed in Europe, Asia, or Latin America at the time of the Commission's determination; that Mr. Moss testified that he did not believe there was idle tube capacity in Japan at that time; that the Taiwan and Korean capacity was not in place; that there was growing demand for tubes in home computers and video games; that not all Japanese television set producers also produce tubes; and that there were large back orders for tubes in Japan. Further, Matsushita argues that it would not be rational for Japanese companies to

dump since they would be injuring their U.S. subsidiaries.

That Matsushita can point to evidence of record which detracts from the evidence which supports the Commission's decision and can hypothesize a reasonable basis for a contrary determination is neither surprising nor persuasive. It is not the function of a court to decide that, were it the Commission, it would have made the same decision on the basis of the evidence. Our role is limited to deciding whether the Commission's decision is "unsupported by substantial evidence on the record, or otherwise not in accordance with law." In this case, no basis has been shown for holding the Commission's determination unlawful under that limited standard of review.[14]

### Conclusion

Since the Commission used an appropriate standard for conducting a review investigation and its determination under that standard is supported by substantial evidence, the decision of the Court of International Trade is *reversed.*

REVERSED.

### APPENDIX

Matsushita Electric Industrial Co., Ltd., Matsushita Electric Corp. of America, Panasonic Hawaii, Inc., and Panasonic Sales Co., a Division of Matsushita Electric of Puerto Rico, Inc., Victor Co. of Japan, Ltd., and U.S. JVC Corp.

Sanyo Electric Co., Ltd., Sanyo Electric Inc., and Sanyo Manufacturing Corp.

Hitachi, Ltd., Hitachi Sales Corp. of America, and Hitachi Sales Corp. of Hawaii

Toshiba Corp., Toshiba America, Inc., and Toshiba Hawaii, Inc.

Mitsubishi Electric Corp.

Sharp Electronics Corp.

General Corp. of Japan

NICHOLS, Senior Circuit Judge, submits the following additional views:

The court's opinion performs very ably the appellate review which it is our duty to provide, and I join in it cheerfully. It may seem superfluous for me to write more, but I ask indulgence.

The role of the CIT in reviewing ITC determinations is relatively novel, the role of the former CCPA in performing corresponding appellate review was therefore novel also, and since this court is also new, there is a triple newness that would be unnerving to the tradition-bound. 19 U.S.C. § 1516a, under which the CIT conducted its review, was added only by Pub.L. No. 96–39, 93 Stat. 300, Act of July 26, 1979. The court is required to look for support of substantial evidence if it is to hold the ITC action legal, but the record apparently consists of just about every piece of paper in the ITC file. Section 1516–a(b)(1) and (2).

Following its historic practice, the ITC conducted its investigation more like a congressional committee than a court, and of course it was exercising delegated legislative powers. Looking over the record for support of the conclusions by "substantial evidence" is something like examining the files and hearing transcripts of a congressional committee to determine whether it had the support of substantial evidence when it recommended passage of a bill. We do it here because the statute says we must, but we should not labor under the delusion it is always going to be easy. This time it is.

Like a congressional committee, the ITC allowed counsel for interested parties to be sworn and to make statements for the record as to what their clients wished the ITC to believe. These witnesses, American lawyers for Japanese companies having headquarters in Japan, hardly made any pretense of personal knowledge of the matters they spoke of, or even of possessing hearsay evidence such as might persuade a fact finder operating under a strict "sub-

---

**14.** The additional views of Judge Nichols have not been incorporated into the majority opinion only because they read so well as separately stated.

stantial evidence" standard of record making and judicial review. The ITC lamented it did not have much, if any, information as to the impact of the existing anti-dumping order on the policies of the Japanese producers, nor was it given the means of predicting what they would do if the order were lifted. Certainly they could have done anything at all without the breach of any pledged word or falsification of any sworn factual evidence.

The CIT judge said this lament reflected an impermissible throwing of the burden of proof on the proponents of lifting the order. I do not agree. There is a subtle but recognizable difference between the burden of proof and the burden of going forward. This investigation was conducted at all because these attorneys had requested on behalf of their clients that it should be. If they did not intend to waste ITC resources, it would be reasonable to think they would be in possession of information which, if believed and not controverted, would constitute a prima facie case. The burden on a complaint of racial discrimination under Title VII of the Civil Rights Act, 42 U.S.C. § 2000e *et seq.* (1964) to come forward with a prima facie case, comes to mind as an apt analogy. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).

The failure to come forward with any real evidence suggests to the ordinary untutored mind, as it did to the sophisticated ITC Commissioners, that there was nothing to come forward with. It is not a question of not coming forward with evidence in the possession of someone else. The Japanese exporters of televisions were the ones who knew, and the only ones who knew, what the real impact of the prior order had been and was then being, upon their trade policies. They were the only ones who knew what they would do if their counsel were successful in getting the prior order lifted. To my mind, the failure to produce anything concerning these matters would have been an implicit admission justifying refusal to lift the order had there been no more.

But of course there was more. This court pays just tribute to the uncontradict-ed testimony of Mr. Moss. It is even more impressive in the unedited transcript than in the government summary. His company, Corning Glass, has a direct interest in the commerce under investigation since it is a leading producer of television tubes. He had recently traveled on its behalf in the Orient. There may not be a word of truth in any of his testimony, but we are required to suppose otherwise, since it was given in person and under oath and subject to cross-examination, since his knowledge of the subject was obviously unsurpassed, and since no opposing testimony was introduced, as it easily could have been if Mr. Moss' testimony were false or if his opinions were erroneous. The Moss testimony is just the kind a court must look for when it is required to review a determination under the "substantial evidence" standard. One who seeks to overturn a quasi-legislative determination, reviewed under that standard, without such testimony in support of his own position is undertaking a heavy load indeed.

The Japanese exporters evidently wanted to get the order lifted "on the cheap," without really divulging any relevant information in return. I do not think Congress ever intended to give them such a power. Had they wanted the lifting badly enough to be willing to come and testify in person, or by deposition, or even by affidavit, we might have had a different case.