**BMT COMMODITY CORP., and Delca Distributors, Inc., Plaintiffs,**

v.

**UNITED STATES and United States International Trade Commission, Defendants,**

and

**Codfish Corp., Defendant-Intervenor.**

Court No. 85-7-00915.

United States Court of International Trade.

July 22, 1987.

Freeman, Wasserman & Schneider, Jack G. Wasserman, New York City, for plaintiffs.

Lyn M. Schlitt, General Counsel, Michael P. Mabile, Asst. General Counsel and Ju-

dith M. Czako, U.S. Intern. Trade Com'n, Washington, D.C., for defendants.

Patton, Boggs & Blow, Bart S. Fisher and Michael D. Esch, Washington, D.C., for defendant-intervenor.

## OPINION

RESTANI, Judge:

Plaintiffs initiated this action to challenge the International Trade Commission's (Commission) final affirmative dumping determination in *Certain Dried Salted Codfish from Canada,* Inv. No. 731–TA–199, USITC Pub. No. 1711.[1] In its determination, the Commission concluded that "the establishment of an industry in the United States is materially retarded by reason of imports of dried heavy salted codfish from Canada, which the Department of Commerce (Commerce) has determined are sold at less than fair value (LTFV)." ITC Determination at 3.

The domestic industry under review consists of only one company, defendant-intervenor Codfish Corporation, which commenced operations in November 1982, in Ponce, Puerto Rico.[2] *Id.* at 5. Due to declining import prices, Codfish Corporation suffered large operating losses from 1982 through the third quarter of 1984. On July 19, 1984, it filed its antidumping petition; five months later it ceased operating and filed a petition for reorganization under the federal bankruptcy laws. At the time the final determination was published, Codfish Corporation had taken steps to reopen its plant. It received approval for a $2 million line of credit from the Government Development Bank, and negotiated several new agreements for the procurement of fresh cod and the distribution of its processed product. *Id.* at 8–9.

In its determination, the Commission concluded that a pervasive pattern of underselling by dominant Canadian imports of codfish had resulted in the suppression and depression of domestic prices. *Id.* at 11. The Commission confirmed virtually all of defendant-intervenor's allegations of lost sales and revenues, *id.* at 12, and further found that the prices of Canadian imports, after falling continuously from 1982 through the third quarter of 1984, rose across the board after defendant-intervenor ceased production in the final quarter of 1984. *Id.* at 11.

Plaintiffs do not contest these conclusions; rather, they challenge a portion of the legal framework developed by the Commission for cases involving the material retardation of domestic industries. The parties agree that existing case law, administrative precedent, and legislative history offer little guidance in this area. Prior Commission determinations establish only that "(1) application of the material retardation standard is not limited to industries that have not yet begun production, but extends as well to new facilities that have initiated production but have not yet stabilized their operations; (2) because the attempt to establish a new industry is inherently unique, determination of whether the establishment of an industry is materially retarded is to be made on a case-by-case basis; and (3) in instances involving an industry that has not yet undertaken production, there must be a sufficient indication that the industry has made a 'substantial commitment' to commence production."[3] *Id.* at 4–5.

---

1. The results of the final determination are also published at 51 Fed.Reg. 16,904 (May 7, 1986).

2. Although the Tariff Act of 1930 does not specifically include Puerto Rico as part of the United States for purposes of the Act, plaintiffs have not contested this issue. The court notes that the Tariff Schedules of the United States and the Antidumping Act of 1921 both contained definitions of "The United States" which encompassed Puerto Rico. The Trade Agreements Act of 1979 did not adopt the definition of "United States" included in the Antidumping Act of 1921, but there is no indication that Congress intended to exclude Puerto Rico from the purview of the Act. *See* S.Rep. No. 249, 96th Cong., 1st Sess. at 107 (no substantial rules intended to be changed except as indicated in the Report), *reprinted in* 1979 U.S.Code Cong. & Admin.News 381, 493.

3. *See, e.g., Thin Sheet Glass from Switzerland, Belgium, and the Federal Republic of Germany,* Inv. Nos. 731–TA–127, 128, and 129, USITC Pub. No. 1376 (1983) (Preliminary Dumping); *Certain Commuter Airplanes from France and Italy,* Inv. Nos. 701–TA–174 and 175, USITC Pub. No. 1296 (1982) (Preliminary Dumping); *Salmon Gill Fish Netting of Manmade Fibers from Japan,*

The Commission developed additional legal standards to complete the analytical framework necessary for its material retardation analysis. It first attempted to ascertain whether the investigation involved material injury or the threat thereof, rather than material retardation. Because defendant-intervenor was "never able to stabilize production at a level which even approached a reasonable break-even point," the Commission determined that its operations were never "established," and, therefore, that material retardation was the applicable legal standard. *Id.* at 5.

Having concluded that material retardation was at issue, the Commission then stated that the proper inquiry for determining the presence of material retardation was "whether the level of activities of Codfish Corporation reflect merely the normal start-up conditions of a company entering an admittedly difficult market or whether the performance is worse than what could reasonably be expected and thus be deemed materially retarded." *Id.* The majority determined that Codfish Corporation's performance was, in fact, worse than what could reasonably be expected, but it did not conclude that material retardation had been established at this point. Instead, the majority stated that the viability of defendant-intervenor's business was also a relevant concern in this case. *Id.* at 7. The elements of viability that the Commission considered important in this case were "the ability to produce a marketable product, which is qualitatively acceptable to purchasers, and which can be sold at a price which is competitive with fairly traded imports." *Id.* at 8. After finding that Codfish Corporation's business was viable, the Commission concluded that material retardation had been established. *Id.* at 8–9.

Plaintiffs object to the Commission's treatment of the viability issue, claiming that the legal standard of viability formulated by the majority was not in accordance with law, and that its finding of viability

Inv. No. 751–TA–5, USITC Pub. No. 1234 (1982) (Review of Dumping Determination under § 751(b) of the Tariff Act of 1930).

was unsupported by substantial evidence. These issues are addressed below.

I. *The Legal Propriety of the Commission's Viability Standard*

■ Plaintiffs argue that the Commission's determination was not in accordance with law because a majority of the commissioners did not adopt "a single, identifiable standard of law" on the issue of viability. Plaintiffs' Reply Brief at 7. In the determination, one commissioner focused solely upon the viability of the domestic industry *during the period of investigation.* He explicitly stated that, in his opinion, the petitioner need not prove future viability. ITC Determination at 7 n. 16. Another commissioner considered the viability of Codfish Corporation *at its inception,* but stated that future viability was also relevant "as it strengthen[ed] his conclusions concerning the viability of the domestic industry." *Id.* at 8 n. 20. The two remaining commissioners who concurred in the majority opinion focused upon the viability of Codfish Corporation at its inception and in the future. *Id.* at 7–8.

In order for the Commission's determination to be upheld in this case, the court must be able to discern from the determination that a majority of the Commission has based its conclusions upon legally sufficient reasoning. *See* 19 U.S.C. § 1677(11)(c) (1982). *Cf. USX Corp. v. United States,* 11 CIT ——, 655 F.Supp. 487, 497 (1987) (action remanded where majority of commissioners failed to cumulate imports for reasons contrary to law). The court will first consider the soundness of the Commission's legal approach and will then discuss the extent to which the legal underpinnings were accepted by the individual commissioners.

None of the parties to this proceeding have challenged the Commission's conclusion that Codfish Corporation's viability at inception is a relevant consideration in this case.[4] As plaintiffs have stated, it would

4. The majority determination does not explicitly state that the Commission was considering the viability of Codfish Corporation from the time of its inception; however, this fact may be in-

be counterproductive for the unfair trade laws to provide relief to domestic industries that cannot compete. *See* R. Caves and R. Jones, *World Trade and Payments* 260 (1973) ("protection is not worthwhile if the [domestic] industry could never compete"); *accord,* J. Viner, *Dumping: A Problem in International Trade* 137 (1966). The imposition of duties upon foreign imports would only increase costs to American consumers, without providing a reciprocal benefit to nascent American industries. In its determination, the Commission considered Codfish Corporation's labor, energy and raw materials costs; the cost-effectiveness of its distribution and marketing channels; and the effect of the hot, humid Puerto Rican climate on the cost of drying the codfish. ITC Determination at 7–8. These variables can all affect the viability of a nascent enterprise, and therefore were proper objects of scrutiny for the Commission.[5]

Although it agrees with the analysis of "viability at inception" performed by the Commission, the court has some reservations about the Commission's analysis of "future viability." Observing that Codfish Corporation had ceased operations and

filed for bankruptcy in November 1984, the Commission stated that "[t]he future viability of petitioner's business operations is a relevant issue in determining whether the establishment of a domestic industry is being materially retarded." ITC Determination at 8. It then discussed Codfish Corporation's new plans for recapitalization, product distribution, and alternative sources of cod supply. *Id.* at 8–9. On the basis of this information, the Commission performed a "break-even analysis" of Codfish Corporation's operations to determine whether it "could be able to recommence operations, given fairly traded competition from imports, and stabilize its production and sales at a level which will allow it to become established." *Id.* at 9.[6]

■ The import of the Commission's analysis is that it could have *denied* relief based upon the conditions under which Codfish Corporation was to be reorganized. In other words, even if it had found Codfish Corporation's pre-reorganization problems were attributable to LTFV imports, the Commission could have made a negative determination simply because the imposition of duties would not have been an

ferred from the Commission's statement that it analyzed the company's *initial* business plan and *original* marketing and feasibility study. ITC Determination at 8.

5. Codfish Corporation seizes upon language in the determination to argue that the Commission was solely concerned with *inherent* viability. *See* ITC Determination at 7. It contends that the inherent viability standard requires the Commission to conclude that an industry is not viable only if *"inherent* disadvantages *entirely unrelated to the effects of LTFV imports* ... remove *any* commercial possibility that the industry could become established." Brief of Defendant-Intervenor at 13. In effect, Codfish Corporation requests that the Commission "defer to the business judgment of investors, so long as their plan of operations is within the realm of commercial reasonableness." *Id.* at 12.

In the determination and in its brief, the Commission appears to have used the terms "inherent viability" and "viability at inception" interchangeably. Its finding of viability was based upon evidence that "the initial business plan of [Codfish Corporation] appear[ed] reasonably calculated and could have succeeded." ITC Determination at 8. This analysis of viability does not appear to be as deferential to the judgment

of investors as the interpretation offered by Codfish Corporation. Some of the factors considered by the Commission, such as marketing channels and energy costs are not truly *inherent* in the nature of an enterprise since they may change over the short term. Furthermore, nothing in the Commission's determination implies that the judgment of investors, no matter how misguided, should be accorded substantial deference. Without attempting to define the parameters of the viability standard further, a task the Commission will no doubt undertake in future cases, the court simply concludes that the Commission acted reasonably in the selection of factors to be considered in making the viability determination here.

6. The Commission's use of the term "future viability" is somewhat confusing. A determination that an industry is "viable" necessarily means that it is capable of surviving into the future. To the extent that "future viability" is used in this redundant fashion, the court has no objection to it. In this investigation, however, the term "future viability" refers to the viability of Codfish Corporation only in its restructured condition. The court's objection to the Commission's "future viability" analysis specifically refers to the use of the term in this fashion.

effective solution to the injured industry's problems.

Such a test would run afoul of 19 U.S.C. § 1673d(b)(1)(B), by allowing the Commission to make a negative determination when material retardation is being caused by LTFV imports. In its determination, the Commission considered the reorganized industry's new characteristics to evaluate future viability. The Commission, however, failed to consider how the existence of LTFV imports in the marketplace affected the terms upon which the reorganized Codfish Corporation procured fresh financing and signed new contracts. Where the Commission judges "future viability" based upon factors affected by LTFV imports, without adequately considering such effects, its analysis is inherently flawed. If no allowance is made for the continuing effects of LTFV imports, foreign enterprises that force nascent domestic firms into bankruptcy, in certain circumstances, could preclude indefinitely the establishment of such industries. Such a result cannot reasonably be intended by the statute.[7]

The Commission's analysis of "future viability," however, does not compel remand. The Commission did not make a *negative* determination based upon "future viability." The Commission's decision was affirmative, and its analysis is sufficient to support the affirmative determination. All four commissioners concurring in the majority opinion agreed on the analysis of the relevant issue here: Codfish Corporation's

viability apart from the effects of LTFV imports (which in this case is essentially "viability at inception").[8] The only difference of opinion among this group concerned the propriety of "future viability" as a relevant factor in the case.[9] For this reason, the court concludes that the determination was reached in a manner in accordance with law.

## II. Substantial Evidence

■ Plaintiffs also contend that the Commission's final determination is not supported by substantial evidence in the record. "Substantial evidence" refers to "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Matsushita Electric Indus. Co. v. United States*, 750 F.2d 927, 933 (Fed.Cir.1984) (quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 477, 71 S.Ct. 456, 459, 95 L.Ed. 456 (1951)). Again, plaintiffs do not challenge the portion of the determination regarding causation, but attack only that portion of the determination relating to the viability of Codfish Corporation. Specifically, plaintiffs contend that the Commission relied upon "error-ridden" documents; accepted the company's unrealistic assertions regarding its fixed costs, future sources of cod, and future costs of transportation; and improperly failed to consider the declining market for cod in its break-even analysis. Plaintiffs' Brief at 24–34. In addition, plaintiffs contend that Codfish Corporation was not via-

---

7. Plaintiffs argue that the Commission's finding of "future viability" is equivalent to a determination that there is a "threat of future injury" to a nascent industry. Plaintiffs' Brief at 12. Plaintiffs contend that this test defies Congressional intent, because Congress specifically chose to incorporate a "threat" analysis only with respect to material injury of an *established* industry. *See* 19 U.S.C. § 1673d(b)(1)(A) (1982 & Supp. III 1985). The court does not find this argument persuasive. The Commission did not find that there was a threat of "future retardation," as plaintiff contends. Rather, the Commission concluded that the reorganized corporation could become established. ITC Determination at 9. In effect, the Commission performed a present material retardation analysis with respect to both the original and restructured entities.

8. The court does not preclude the possibility that in another case it can be demonstrated that an industry once considered viable is no longer viable because of changing conditions, apart from the effects of LTFV imports. *See supra*, note 6. This is not the case at hand. Plaintiffs have made no showing that there were such unaffected factors.

9. One of the four commissioners in the majority stated that he had considered "viability during the period of the investigation," rather than viability at inception. ITC Determination at 7 n. 16. This commissioner, however, appears to have considered the same factors as the other members of the majority. Even if his reasoning were construed to conflict with the other members, the determination would still be supported by a majority of three commissioners.

ble at its inception because it was located in a hot, humid region where drying costs are high, and because it lacked adequate capital, marketing ability, and an economical source of cod. Plaintiffs' Brief at 18–22.

Plaintiffs do not contend that the initial feasibility study considered by the Commission was flawed because of defects in the raw data contained in the report. Rather, plaintiffs challenge the conclusions reached in the document, and express a preference for the findings made in a separate study prepared by the Citicorp Capital Markets Group. Plaintiffs allege that the majority erred by not considering this report and adopting some of its conclusions. In essence, plaintiffs are questioning the thoroughness of the Commission's investigation. *See Kenda Rubber Indus. Co. v. United States*, 10 CIT ——, 630 F.Supp. 354, 356 n. 4 (1986) (contrasting determinations not supported by substantial evidence to those in which the underlying investigation was not legally sufficient).

In response, the government has challenged the relevancy of the Citicorp report, stating that "a study prepared with the benefit of two years experience, and the hindsight which accompanies experience, is hardly a reasonable basis upon which to conclude that Codfish Corporation was not viable at its inception." Defendants' Brief at 20. Plaintiffs dismiss this argument as "crypto-legalese mumbo-jumbo" and maintain that the timing of the report should not affect its probative value on the issue of viability. Plaintiffs' Reply at 13.

Plaintiffs' characterization of defendants' argument is a bit overstated, but not far off the mark. A report analyzing the progress of an industry over time may contain important insights into how a specific factors affect profitability, provided that these factors are considered in light of the possible effect of LTFV imports. Nevertheless, it is apparent that the Citicorp study *was* considered by the Commission during the preparation of its own break-even analysis. *See* ITC Determination at A–24. Thus, the ITC cannot be said to have conducted an insufficient investigation as a matter of law; the real question at issue is whether, in light of the Citicorp report, the Commission's findings are supported by substantial evidence.

After reviewing the remaining allegations and related material in the record, the court finds that the Commission's determination was supported by substantial evidence. Although plaintiffs assert that Codfish Corporation's working capital was inadequate, they presented no evidence to the Commission regarding the level of working capital necessary for the proper functioning of Codfish Corporation's facility. Plaintiffs offered some evidence on the amount of working capital their own facility requires, but this data was not shown to be applicable to Codfish Corporation. Hearing Transcript at 112. Furthermore, defendant-intervenor presented uncontroverted evidence that Codfish Corporation never lacked working capital with which to purchase inventory. *See* Prehearing Brief of Codfish Corp. at 36.

From the record, it is also clear that the Commission was aware of Codfish Corporation's practice of marketing strictly to wholesale purchasers. ITC Staff Report at A–13. Although plaintiffs argue that this strategy destroyed the company's viability, there is no evidence in the record demonstrating that this was an unreasonable practice, or that it was an inherent feature of the company's business strategy. Plaintiffs cite a passage from the Citicorp study which concluded that the company "did not establish a coherent marketing strategy," but the study did not conclude that direct access to retailers was essential for viability. It stated that "[a] link to an existing strong wholesaler with a good sales force is the logical route for the company to follow...." *Citicorp Study*, Doc. 2, at 49.

The Commission also rejected plaintiffs' assertion that consumer demand for cod was declining. It specifically noted that the sales volume of codfish was stable at relatively high price levels in 1985, a fact suggesting that demand was not declining for the product. ITC Determination at 12. Plaintiffs' remaining contentions, that sources of codfish were too expensive, and that the Puerto Rican climate is unac-

ceptable for a fish drying operation, were found by the majority not to outweigh advantages that Codfish Corporation gained by locating near a large codfish market with low labor costs. ITC Determination at 7. It is not the function of this court to "re-weigh" factors considered by the Commission; it may only consider whether the Commission's determinations are supported by substantial evidence. *Matsushita Electric*, 750 F.2d at 936. The Commission has clearly satisfied this test.

As indicated, the court has concluded that the Commission's finding regarding initial viability was supported by substantial evidence. The court need not consider whether substantial evidence supported the Commission's determination with respect to the industry's post-bankruptcy cod sources, transportation costs, and re-capitalization because the record contains no evidence to support a decision to set aside the finding of initial viability due to changed circumstances independent of LTFV imports.[10]

For the foregoing reasons, the Commission's decision is sustained.

### JUDGMENT

This case having been duly submitted for decision and the Court, after due deliberation, having rendered a decision herein; now, in conformity with said decision,

IT IS HEREBY ORDERED: that plaintiffs' motion for judgment based upon the administrative record is denied and this action is hereby dismissed.

---

**10.** As discussed above, the court does not find it necessary to review the Commission's discussion of "future viability." The court notes, however, that if it had reviewed this aspect of the determination, it would have rejected plaintiffs' arguments. The Commission's "future viability" analysis considered the same factors discussed in its analysis of "viability at inception," and was supported by substantial evidence contained in the Citicorp study and in the Commission's own break-even analysis.