914 F.2d 233
 12 ITRD 1785
 AVESTA AB and Avesta Stainless, Inc., Plaintiffs-Appellants,
v.
The UNITED STATES, Defendant-Appellee,
Allegheny Ludlum Steel Corporation, Armco Inc., Jessop Steel
Corporation, J & L Specialty Products Company,
Washington Steel Corporation, and United
Steelworkers of America,
AFL/CIO-CLC, Defendants.
 No. 90-1120.
 United States Court of Appeals,
Federal Circuit.
 Sept. 14, 1990.
 
 1
 Patrick C. Reed, Freeman, Wasserman & Schneider, New York City, argued for plaintiffs-appellants. With him on the brief was Jack Gumpert Wasserman.
 
 
 2
 Stephen McLaughlin, Office of the General Counsel, U.S. Intern. Trade Com'n, Washington, D.C., argued for defendant-appellee. With him on the brief were Lyn M. Schlitt, General Counsel and James A. Toupin, Asst. General Counsel. Jeffrey Beckington, Collier, Shannon & Scott, Washington, D.C., argued for defendants. With him on the brief was Paul C. Rosenthal.
 
 
 3
 Before MARKEY, Circuit Judge* BENNETT, Senior Circuit Judge, and CONTI, Senior District Judge.**
 
 
 4
 CONTI, Senior District Judge.
 
 DECISION
 
 5
 Avesta AB and Avesta Stainless, Inc. (collectively Avesta) appeal from a decision of the Court of International Trade affirming the determination of the United States International Trade Commission (ITC) not to institute a review under section 751(b) of the Tariff Act of 1930, (19 U.S.C. Sec. 1675(b)), of an outstanding antidumping order for imported stainless steel plate from Sweden. We affirm.
 
 BACKGROUND
 
 6
 In 1973, the United States Tariff Commission issued a finding that over the previous several years Swedish stainless steel plate was being dumped in the domestic market at less than fair value, and that these imports were causing material injury to a domestic industry. An antidumping order was issued and remains in effect today.[1] In 1985, Avesta AB, the sole Swedish producer and exporter of stainless steel plate, along with its domestic affiliate, Avesta Stainless, Inc., sought under section 751(b) of the Tariff Act of 1930, 19 U.S.C. Sec. 1675(b), to have the 1973 antidumping order revoked or modified in light of changed circumstances. Section 751(b) provides that the ITC shall conduct a full investigation of whether to revoke an antidumping order whenever the ITC receives a request which it determines as a threshold matter "shows changed circumstances sufficient to warrant a review." 19 U.S.C. Sec. 1675(b)(1). The ITC dismissed Avesta's 1985 review request after finding that none of the circumstances cited by Avesta constituted a sufficient change in circumstances to warrant investigation. This decision was upheld by the Court of International Trade. Avesta v. United States, 689 F.Supp. 1173 (Ct.Int'l Trade 1988) (Avesta I ).
 
 
 7
 In 1987, after amending its list of alleged changed circumstances, Avesta again petitioned for a section 751(b) investigation of the 1973 antidumping order.[2] The ITC, by a three-to-two margin, once more determined that Avesta did not show sufficient changes in circumstances to warrant further review. As before, the Court of International Trade affirmed the ITC's decision. Avesta AB v. United States, 724 F.Supp. 974 (Ct.Int'l Trade 1989) (Avesta II ). It is from that affirmance that Avesta appeals.
 
 ISSUE
 
 8
 Was the Court of International Trade correct in holding that the determination by the ITC not to commence an investigation to review the 1973 antidumping order was not arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law.
 
 OPINION
 
 9
 The standard of review is undisputed. The ITC's determination not to institute a review investigation under section 751(b) must stand unless "arbitrary and capricious, an abuse of discretion, or otherwise not in accordance with law." 19 U.S.C. Sec. 1516a(b)(1)(A). Nonetheless, Avesta raises an issue of first impression in arguing that the ITC made a clear error of law by failing to apply the appropriate legal standard as to what qualifies as "changes in circumstances sufficient to warrant review " under section 751(b). 19 U.S.C. Sec. 1675(b)(1) (emphasis added). Essentially, Avesta's contention is that the critical statutory language--"sufficient to warrant review"--is not self-executing in terms of the level of persuasion required at this initial inquiry stage and does not guide or in any meaningful way constrain the ITC's exercise of discretion. In fact, Avesta asserts that in this case, given the indeterminate meaning and application of these critical terms in section 751(b), the ITC's decision does not manifest that any guiding legal standard was applied in reaching the conclusion that appellant did not show changed circumstances sufficient to warrant review.
 
 
 10
 Rather than leaving it to the ITC to interpret according to the ultimately indeterminate terms of section 751(b) what level of persuasion is necessary to trigger a review investigation, plaintiffs suggest that "a reasonable appearance" of changes in circumstances should be the rule of decision regarding the sufficiency of alleged changes to warrant a review. Petitioner cites in support of this standard the fact that at issue here is a threshold inquiry. Congress's imposition of the ultimate burden of persuasion in the investigation under section 751(b) on petitioner would be mere surplusage, Avesta contends, if a petitioner is held to the same standard of proof at the initial inquiry stage. Cf. Matsushita Elec. Indus. Co. v. United States, 750 F.2d 927 (Fed.Cir.1984) (granting a review request does not constitute proof that revocation is mandated but merely sets the review process in motion). Finally, Avesta argues that an unfairly high burden forces decisions to be made on incomplete factual records and frustrates statutory intent that antidumping duties be remedial rather than punitive--that they be imposed only where material injury to domestic industry will persist.[3]
 
 
 11
 The court agrees with appellant insofar as it asserts that the critical language in section 751(b) contains less than exacting standards of decision. The real issue, though, is whether congressional intent compels this court to impose further standards on the ITC's determinations or, as appellees argue, whether Congress delegated the decision as to what constitutes a change in circumstances sufficient to warrant a review investigation to the discretion of the ITC to be determined on a case-by-case basis. After canvassing the legislative history and discernable congressional intent, we agree with the latter position.
 
 
 12
 The genesis of section 751(b) reveals that even prior to the enactment of the statute in 1979, it was the practice of the ITC to entertain requests for reviews of existing injury determinations on an ad hoc basis.[4] In 1974, the Senate Committee on Finance explicitly approved such practices and even rejected efforts to codify the reconsideration process along the lines of section 751(b). The Committee stated:
 
 
 13
 [P]roposals to include statutory language regarding certain concepts and terms, such as ... reconsideration of agency determinations and findings ... were not accepted for the reason that the Committee believes that the matters involved are adequately treated under existing practices and are best left to individual case determinations without additional statutory guidelines.
 
 
 14
 S.Rep. No. 1298, 93d Cong., 2d Sess. 178-179, 181 (1974) (emphasis added), U.S.Code Cong. & Admin.News 1974, p. 7186. In 1977, the ITC promulgated a regulation which formally adopted this practice:
 
 
 15
 (c) Institution of investigation. The ITC may institute an investigation ... upon receipt of an application ... from an interested person specifying the changed circumstances forming the basis for review....
 
 
 16
 19 C.F.R. Sec. 207.5(c) (1978). Congress was fully aware of this regulation and practice when, in 1979, it repealed the Antidumping Act of 1921, 19 U.S.C. Sec. 160 (1921) and replaced it with the Trade Agreements Act of 1979, Pub.L. No. 96-39, Sec. 107, 93 Stat. 144, 193, (1979), which incorporated section 751(b). S.Rep. No. 249, 96th Cong., 1st Sess. 79-81 (1979); H.R.Rep. No. 317, 96th Cong., 1st Sess. 71-72 (1979), U.S.Code Cong. & Admin.News 1979, pp. 381, 465-67. In light of this history, Congress's knowing choice of the "sufficient to warrant review" language in section 751(b) manifests its intent that the review process continue to proceed on a case-by-case basis.
 
 
 17
 In 1984, Congress discussed and enacted amendments to section 751 in the Tariff and Trade Act of 1984, Pub.L. No. 98-573, 98 Stat. 2948 (1984). The court finds it persuasive that the detailed amendments to section 751 left untouched the ad hoc nature of ITC decisions to institute review. See Kelly v. United States, 826 F.2d 1049, 1052 (Fed.Cir.1987) (Congress adopts administrative interpretation of statute when it reenacts statute unchanged). Certainly there was ample evidence of the ITC's practice under section 751(b).[5] If Congress had felt it necessary to curtail its broad delegation of discretion to the ITC in these matters, it could have supplemented the statutory language of section 751(b) with the "reasonable indication" standard it employed for preliminary determinations of injury, 19 U.S.C. Sec. 1673b(a), or it could have injected some other standard such as the "reasonable appearance" standard proposed by Avesta. Significantly, Congress chose not to do so.
 
 
 18
 Finally, Congress's adoption of a limited standard of judicial review of the ITC's determinations under section 751(b) further manifests its intent to broadly commit such decision to the discretion of the agency. In choosing such a narrow standard of review Congress specifically deferred to the agency's expertise and "entrusted the decision-making authority in a specialized, complex economic situation to administrative agencies." S.Rep. No. 249, 96th Cong., 1st Sess. 252 (1979), U.S.Code Cong. & Admin.News 1979, pp. 381, 638. Indeed, the Supreme Court has instructed that because the arbitrary and capricious standard applies in areas of special agency expertise, substantial deference must be afforded the agency's determinations so long as they possess a rational basis in fact. Consolo v. Federal Maritime ITC, 383 U.S. 607, 620-21, 86 S.Ct. 1018, 1026-27, 16 L.E.2d 131 (1966); Zenith Radio Corp. v. U.S., 437 U.S. 443, 450-01, 98 S.Ct. 2441, 2445-46, 57 L.Ed.2d 337 (1978); See also American Lamb Co. v. United States, 785 F.2d 994, 1001 (Fed.Cir.1986).
 
 
 19
 The court finds that Congress's approval of the ad hoc administration of section 751(b) emerges from the examination of the evolution, language, applicable standard of review and subsequent history of this provision. The ITC's finding that Avesta had not established changed circumstances sufficient to warrant review was, in fact, an "exercise of discretion ... predicated upon judgment anchored in the language and spirit of the relevant statutes and regulations." Freeport Minerals Co. v. United States, 776 F.2d 1029, 1032 (Fed.Cir.1985). As such, its conclusion was in no sense an error of law. What remains, then, is appellant's contention that the ITC's decision was arbitrary and capricious and an abuse of discretion.
 
 
 20
 The ITC determined, after evaluating the record, that Avesta's alleged changed circumstances, many of which had recently been rejected by the ITC and the Court of International Trade in Avesta I, were either the direct and anticipated result of the imposition of import relief, were unsupported by the record, or had no significant connection to the impact of dumped Swedish stainless steel plate on domestic industry. For instance, the fact that imports declined and are presently de minimis was found to be an expected result of the antidumping order. The acquisition of a domestic mill did not, the ITC majority concluded, sufficiently alter Avesta's import practices. Avesta's monopolization of the Swedish industry, while decreasing its absolute productive capacity, still left sufficient unused productive capacity according to the ITC to enable Avesta to dump plate here and still satisfy its domestic and other foreign markets. The allegation of increases in exports to the European Community evaporated under scrutiny by the ITC. In addition, the existence of VRA's, which placed no restrictions on the quantity of Swedish imports while subjecting signatory nations to quotas, was determined not to affect the impact of such exports on the domestic industry. Finally, the ITC concluded after conducting a like-product analysis that the allegedly uniquely Swedish types of plate were neither factually nor legally entitled to "exclusion." The court concludes after independently assessing the record and arguments before it that the ITC's determination that Avesta had not demonstrated changes sufficient to warrant review was not arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law. Further elaboration, in light of the trial court's thorough and well reasoned examination of this issue, Avesta AB v. United States, 724 F.Supp. 974, would only add needless redundancy and therefore the court adopts the examination and reasoning of that opinion as its own.
 
 CONCLUSION
 
 21
 For the reasons stated above, the Court of International Trade's decision in this case is
 
 
 22
 AFFIRMED.
 
 
 
 *
 Circuit Judge Markey vacated the position of Chief Judge on 27 June 1990
 
 
 **
 The Honorable Samuel Conti, Senior District Judge, United States District Court for the Northern District of California, sitting by designation
 
 
 [1]
 The antidumping order was published in the Federal Register, 38 Fed.Reg. 15,079 (1973)
 
 
 [2]
 The eight alleged changes in circumstances raised in plaintiffs' 1987 petition for review before the ITC were:
 
 
 [1]
 The number of stainless steel producers in Sweden declined from four in 1972 to a single producer in 1987 and Sweden's capacity to produce stainless steel has declined as a result;
 
 
 [2]
 Imports of hot-rolled stainless steel plate have been and remain at de minimis levels;
 
 
 [3]
 The de minimis levels of imports from Sweden result from the 1976 acquisition of a U.S. hot-rolled plate producing mill by Avesta;
 
 
 [4]
 Swedish steel exports to the European Community (EC) rose sharply after it was allowed duty-free entry in the EC in 1972
 
 
 [5]
 In contrast to the early 1970s, Voluntary Restraint Agreements (VRAs) setting export quotas were signed by a number of competitor countries, except Sweden, thereby adding a measure of protection for U.S. producers of stainless steel;
 
 
 [6]
 The fact that Sweden has not entered into a VRA places Avesta at a competitive disadvantage because its exports remain subject to antidumping and countervailing duties while those from VRA countries do not;
 
 
 [7]
 That Avesta produces a continuously made cold-rolled plate in widths which U.S. firms are unable to produce; and,
 
 
 [8]
 Avesta's current exports to the U.S. include two types of stainless steel plate that are patented, which did not exist in the 1970s, and which U.S. firms cannot supply
 The petition to the ITC asked that the order at least be modified to exclude the allegedly uniquely Swedish products described in paragraphs 7 and 8 above. The court notes that the first four items above were raised in Avesta's 1985 petition and, as such, had previously been rejected by both the ITC and the Court of International Trade.
 
 
 [3]
 See Agreement on Interpretation of Article VI of the General Agreement on Tariffs and Trade, Apr. 12, 1979, art. 9, para. 1, 31 U.S.T. 4919, T.I.A.S. No. 9650
 
 
 [4]
 The regulatory origins and prior history of section 751(b), as codified in 19 U.S.C. Sec. 1675(b)(1), are more fully recounted in Avesta I. Avesta AB v. United States, 689 F.Supp. 1173, 1178-1179
 
 
 [5]
 The ad hoc approach to initiating review investigations was manifest in a series of ITC decisions between 1980 and 1984. See e.g., Birch Three-Ply Door Skins From Japan, Inv. No. 751-TA-6, USITC Pub. 1271 (July, 1982); Salmon Gill Fish Netting Of Manmade Fibers From Japan, Inv. No. 751-TA-5, USITC Pub. 1234 (March, 1982)