**CHAPARRAL STEEL COMPANY, Plaintiff,**

**LTV Steel Company and Inland Steel Company, Plaintiff–Intervenors,**

v.

**UNITED STATES, Defendant,**

**Norsk Jernverk A.S., Defendant–Intervenor.**

**Court No. 85–12–01767.**

United States Court of International Trade.

Sept. 28, 1988.

---

Cravath, Swaine & Moore (Alan J. Hruska and Robert L. Nowicki, New York City, on the motion), for plaintiff-intervenors.

Lyn M. Schlitt, Gen. Counsel, Michael P. Mabile, Asst. Gen. Counsel, U.S. Intern. Trade Com'n (Charles H. Nalls, Washington, D.C., on the motion), for defendant.

Cadwalader, Wickersham & Taft (Frederick P. Waite, E. Charles Rowan, Jr., and Arnold B. Podgorsky, Washington, D.C., on the motion), for the defendant-intervenor.

## MEMORANDUM OPINION AND ORDER

CARMAN, Judge:

Plaintiff, Chaparral Steel Company [Chaparral], and plaintiff-intervenors, LTV and Inland Steel Companies [collectively referred to as plaintiffs] seek review of the final negative injury determination by the United States International Trade Commission [ITC or Commission] in *Carbon Steel Structural Shapes From Norway,* Inv. No. 731–TA–234 (Final), USITC Pub. No. 1785 (November, 1985) [*Final Determination*]. Plaintiffs contend the record below contains substantial evidence that dumped and/or subsidized structural shapes from Norway, Poland, Spain, and South Africa are a cause of material injury and threat thereof to the domestic industry. They urge the determination is not in accordance with law because the ITC failed to consider statutory causation criteria and instead substituted other criteria inconsistent with the statute and regulations. They further dispute the ITC's decision not to cumulatively assess the volume and price effects of imports from Poland, Spain, and South Africa in accordance with § 612(a)(2)(A) of the Tariff Act of 1930, as amended, 19 U.S.C. § 1677(7)(C)(iv) (1982).

In regard to the issue of cumulation, the Court finds that the ITC misinterpreted § 1677(7)(C)(iv) and accordingly made an erroneous decision not to consider the effects of the dumped and/or subsidized imports from Poland, Spain, and South Africa. The proper test is whether during the period in which the ITC evaluates injury, there are other imports of the like product

Wiley, Rein & Fielding (Charles Owen Verrill, Jr., Robert E. Nielsen, and Lynn S. West, Washington, D.C., on the motion), for plaintiff.

that are subject to investigation pursuant to the antidumping or countervailing duty laws. The term subject to investigation must be interpreted by reference to the timeframe of the investigation of injury. The status of the proceedings on vote day, the date on which a final determination of injury is rendered, is irrelevant to the analysis. In the present case, the Norwegian injury investigation supplies the frame of reference for the determination of whether cumulation is appropriate. Like imports from Poland, Spain, and South Africa subject to findings of dumping and/or subsidies were present in the market and "subject to investigation" at the time of the Norwegian injury investigation and accordingly all meet the statutory test.

Because of the disposition of this action, the Court finds it unnecessary to reach the remaining issues raised by plaintiff regarding causation and threat of material injury. It may well be that these issues will be treated differently on remand of this action and on proper application of the cumulation provision.

### FACTS

Chaparral, on behalf of the domestic industry producing carbon steel structural shapes [structural shapes], filed an antidumping duty petition with both the ITC and the International Trade Administration [ITA] on December 19, 1984. Chaparral alleged that structural shapes from Norway and Poland were being sold at less-than-fair-value [LTFV] within the meaning of section 731 of the Tariff Act of 1930, as amended, 19 U.S.C. § 1673 (1982).

On February 4, 1985, the ITC rendered a preliminary determination that there was a reasonable indication of material injury, or threat thereof to the domestic industry by reason of structural shapes from Norway and Poland. *See Certain Carbon Steel Products from Austria, Czechoslovakia, East Germany, Hungary, Norway, Poland, Romania, Sweden, and Venezuela,* Inv. Nos. 701–TA–225–34, 731–TA–213–17, 219, 221–26, 228–35 (Prelim.), USITC Pub. No. 1642 (Feb. 1985). The injury analysis covered the period 1982 through June,

1985. Thereafter, the ITA made a preliminary determination of dumping. It found a 59.96 percent dumping margin with respect to Polish imports, *see* 50 Fed.Reg. 23329 (June 3, 1985), and an 8.62 percent dumping margin with respect to Norwegian imports, *see* 50 Fed.Reg. 23326 (June 3, 1985).

On July 11, 1985, Poland and the United States entered into a Voluntary Restraint Agreement [VRA] whereby Poland agreed to reduce significantly exports of steel products including structural shapes to the United States. On July 19, 1985, counsel for Chaparral sent a letter of understanding to the Commerce Department asserting its belief that the restraint agreement with Poland would have equivalent or better results than a final order. Chaparral also asserted its entitlement to construe the VRA as the "functional equivalent of a suspension of an investigation where there is agreement on the part of the exporters to eliminate the injurious effect of sales at less-than-fair-value as provided in Section 734(c) of the 1979 Trade Agreements Act." Reply Memorandum of Plaintiff in Support of Motion for Judgment on the Agency Record at Annex C, p. 2, *Chaparral Steel Co. v. United States* (No. 85–12–01767) [Chaparral's Reply]. On July 24, 1985, the ITC received a letter from Chaparral in which Chaparral withdrew "without prejudice" its petition in the concurrent investigation of structural shapes from Poland. Had Chaparral not withdrawn its petition, presumably, the VRA with Poland would not have gone into effect to the detriment of domestic producers in all sectors of the steel industry.

By notice published August 7, 1985, *see* 50 Fed.Reg. 31931, and August 8, 1985, *see* 50 Fed.Reg. 32101, the ITC and the ITA, respectively, terminated the Polish structural shapes investigation. The Polish investigation was terminated just prior to a final determination by the ITA of LTFV sales of the subject merchandise.

During August of 1985, the ITA postponed its final antidumping duty determination with regard to the Norwegian structural shapes. The ITC thereupon revised its schedule for investigation to coincide

with the ITA determination. *See* 50 Fed. Reg. 32758 (Aug. 14, 1985).

The ITA subsequently determined on October 16, 1985, that imports of structural shapes from Norway were being sold at LTFV by a margin of 13.7 percent. *See* 50 Fed.Reg. 42975 (Oct. 23, 1985). In its final negative determination, the ITC concluded that, while the domestic structural shapes industry was experiencing material injury, there was a lack of causal nexus between this injury and the LTFV imports from Norway. The ITC further found there was no real or imminent threat of material injury to the domestic structural shapes industry. In reaching this determination, the ITC refused to cumulatively assess the volume and price effects of the Polish imports of the like product.

The ITC also refused to cumulatively assess the volume and price effects of dumped Spanish structural shapes as well as subsidized Spanish and South African structural shapes subject to countervailing duty orders.

With regard to dumped Spanish structural shapes, an action was commenced on February 10, 1984 by a petition filed by United States Steel Company. This petition resulted in a final affirmative determination of dumping during December, 1984. *See* 49 Fed.Reg. 48582 (Dec. 13, 1984). On January 18, 1985, Spain and the United States entered into a VRA. United States Steel Company thereupon withdrew its petition against Spain, and the ITC investigation of these imports was terminated. *See* 50 Fed.Reg. 4276 (Jan. 30, 1985).

With regard to subsidized Spanish and South African structural shapes, countervailing duty orders became effective on January 3, 1983, and September 7, 1982, respectively. Both orders were revoked effective October 1, 1984 pursuant to the conclusion of restraint agreements. With respect to South Africa, however, the ITA found that subsidies would apply through 1992. *See* 47 Fed.Reg. 39379, 39380 (Sept. 7, 1982). In regard to Spain, the ITA found that subsidies in the form of three infusions of capital in excess of losses would continue through 1992, 1994, and 1995, respectively. The ITA further found that several other types of subsidies would apply at least through 1986. *See* 47 Fed. Reg. 51438, 51440–44, 51450–53 (Nov. 15, 1982).

In the final negative determination in the Norwegian investigation, the ITC reasoned that the unfairly traded imports must meet three criteria in order to qualify for cumulative analysis: (1) they must compete with both other imports and the domestic like product; (2) they must be subject to investigation; and (3) they must be marketed within a reasonably coincidental period. *Final Determination*, USITC Pub. No. 1785 at 7. In applying this criteria, the ITC determined that allegedly dumped imports from Poland and Spain did not qualify for cumulation since the investigations were terminated by withdrawal of petitions prior to any final determination as to whether the imports were unfairly traded:

> Both Poland and Spain have entered voluntary restraint agreements (VRAs) with the United States. The antidumping investigations regarding imports from these countries of the products at issue in the instant investigations were terminated as a result of the withdrawal of the petitions. The terminations occurred prior to any final determinations as to whether the imports were unfairly traded. The statute does not require cumulation in such circumstances. Because these imports have not been and will not be determined to be unfairly traded and because they are not subject to a pending investigation, we conclude that it is not appropriate to include them in any cumulative analysis.

*Id.* at 8 (footnotes omitted).

In regard to imports of structural shapes from South Africa and Spain subject to countervailing duty orders, the ITC gave three reasons for its refusal to cumulatively assess the volume and price effects of the relevant imports:

> As we have previously stated, we believe that it is not
>
> appropriate to cumulate across countervailing duty and antidumping investigations, and have declined to do so. Fur-

ther, we note that the CVD orders in question are remote in time, and the unfairly traded imports which were subject to the investigations resulting in those orders did not enter the U.S. market reasonably coincident in time with the imports currently under investigation.

*Id.* at 8–9 (footnotes omitted).

## BACKGROUND

In making a final determination in an antidumping investigation, the ITC must ascertain whether any material injury being suffered by the domestic industry has been caused by "imports, or sales (or the likelihood of sales) for importation." 19 U.S.C. § 1673d(b)(1) (1982). Material injury is further defined as harm that is not "inconsequential, immaterial, or unimportant." 19 U.S.C. § 1677(7)(A) (1982).

In analyzing the causal nexus between the condition of the domestic industry and the imports under investigation, the ITC must consider, among other factors, the volume of the imports, the effect of the imports on prices in the United States for like products, and the impact of the imports on the domestic producers of like products. 19 U.S.C. § 1677(7)(B) (1982).

By the Trade and Tariff Act of 1984, Pub.L. No. 98–573, 98 Stat. 2948 [Trade Act], Congress added a provision requiring the ITC to cumulatively assess the volume and price effects of imports from two or more countries when specific criteria are satisfied. The subsection as enacted provides as follows:

(iv) **Cumulation.**—For purposes of clauses (i) and (ii), the Commission shall cumulatively assess the volume and effect of imports from two or more countries of like products subject to investigation if such imports compete with each other and with like products of the domestic industry in the United States market.

19 U.S.C.A. § 1677(7)(C)(iv) (1980 & Supp. 1985). The Commission is therefore required to cumulate from countries the volume and price effects: (1) of like products subject to investigation; (2) if such imports compete with each other and with the like products of the domestic industry.[1]

Prior to the addition of § 1677(7)(C)(iv), the ITC determined whether or not to cumulate on a case-by-case basis without any statutory guidance. Congress mandated cumulation "to eliminate inconsistencies in Commission practice and to ensure that the injury test adequately addresses simultaneous unfair imports from different countries." H.R.Rep. No. 725, 98th Cong., 2d Sess. 37, *reprinted in* 1984 U.S.Code Cong. & Admin.News 4910, 5164.

Of final importance to the background of this case is the standard governing review. This Court may set aside a final determination by the Commission if it concludes that the determination is "unsupported by substantial evidence on the record, or is otherwise not in accordance with law" within the meaning of section 516A(b)(1)(B) of the Tariff Act of 1930, as amended, 19 U.S.C. § 1516a(b)(1)(B) (1982). The Court will now turn to a discussion of the issues of this case.

## DISCUSSION

As previously stated, Chaparral filed a petition on December 19, 1984 alleging dumping by both Poland and Norway. Antidumping duty investigations concerning structural shapes from these countries were commenced on the same day. The ITC's injury analysis focused on the period from 1982 through June, 1985. Preliminary determinations of dumping by both countries were thereafter rendered. On July 11, 1985, one month after the period of investigation of injury by the ITC in the Norway action and one month after the issuance of the preliminary determinations,

---

**1.** Defendant and defendant-intervenors contend cumulation depends upon an additional factor, namely that the imports be "reasonably coincident." In support of this proposition, the defendant and defendant-intervenor refer to language contained in the Conference Report accompanying the Trade Act. *See* H.R.Rep. No.

1156, 98th Cong., 2nd Sess. 173, *reprinted in* 1984 U.S.Code Cong. & Admin.News 4910, 5220. A fair reading of § 1677(7)(C)(iv), the Report, and other portions of the legislative history, however, provide insufficient support for this proposition. For further amplification of this point, see discussion below.

pursuant to the President's Steel Program, *see Steel Import Relief Determination*, 49 Fed.Reg. 36813 (Sept. 20, 1984), the United States and Poland entered into a VRA. As a condition to the Agreement, Chaparral was required to withdraw its petition against Poland. The ITC refused to cumulatively assess the volume and price effects of the Polish imports because the imports had not been and would not be determined to be unfairly traded and were not subject to a pending investigation.

Plaintiffs contend the ITC should have cumulatively assessed the volume and price effects of the imports from Poland for the purposes of determining material injury and threat thereof to the domestic industry by reason of unfairly traded imports. The defendant and defendant-intervenor, by contrast, contend that cumulation was not warranted because Polish imports were no longer "subject to investigation" at the time the ITC rendered a final determination of injury on the Norwegian petition.

 In determining whether or not Polish imports should have been cumulated, the central focus is on the term "subject to investigation" embodied but not defined in the statutory cumulation provision. As held by the United States Court of Appeals for the Federal Circuit in an analogous situation, the term "investigation" must be construed in light of congressional intent. *See Al Tech Specialty Steel Corp. v. United States*, 745 F.2d 632 (1984). Furthermore, while an agency's interpretation of a statute it administers is entitled to deference if reasonable and not in conflict with legislative intent, no deference is entitled to an interpretation that is plainly inconsistent with the express language of the statute, its purpose, and the legislative intent. . *See Board of Governors, Fed. Reserve Sys. v. Dimension Fin. Corp.*, 474 U.S. 361, 368, 106 S.Ct. 681, 686, 88 L.Ed.2d 691 (1986).

The Conference Report accompanying the Trade Act offers little assistance as to the meaning of the term "subject to investigation;" the Report merely repeats the term without embellishment:

> The provision requires cumulation of imports from various countries that each account individually for a small percentage of total market penetration but when combined may cause material injury. The conferees do intend, however, that the marketing of imports that are accumulated [sic] be reasonably coincident. Of course *imports of like products from countries not subject to investigation would not be included in the cumulation.*

H.R.Rep. No. 1156, 98th Cong., 2d Sess. 173, *reprinted in* 1984 U.S.Code Cong. & Admin.News 4910, 5220, 5290 (emphasis supplied). Although the House Ways and Means Committee in a report accompanying the Trade Act also did not define the term "subject to investigation," the Committee afforded valuable insight about the purpose and the legislative intent of the mandatory cumulation provision:

> The purpose of mandating cumulation under appropriate circumstances is to eliminate inconsistencies in Commission practice and to ensure that the injury test adequately addresses simultaneous unfair imports from different countries. Most Commissioners have applied cumulation under certain circumstances but have articulated a variety of differing criteria and conditions. However, cumulation is not required by statute. In addition, a few Commissioners have imposed conditions which do not seem justified to the Committee.

> The Committee believes that the practice of *cumulation is based on the sound principle of preventing material injury which comes about by virtue of several simultaneous unfair acts or practices.* The Committee amended the criteria to permit cumulation of imports from various countries that each account individually for a very small percentage of total market penetration, but when combined may cause material injury. The requirement in the bill as introduced that imports from each country have a "contributing effect" in causing material injury would have precluded cumulation in cases where the impact of imports from each source treated individually is minimal but the combined impact is inju-

rious. The Committee does intend, however, that the marketing of imports that are cumulated be reasonably coincident. Of course, imports of like products from countries not subject to investigation would not be included in the cumulation. H.R.Rep. No. 725, 98th Cong., 2d Sess. 37, *reprinted in* 1984 U.S.Code Cong. & Admin.News 4910, 5164 (emphasis added).

■ In light of the above, the Court finds the defendant's and the defendant-intervenor's literal, plain meaning approach to the cumulation provision contravenes the purposes and clearly articulated legislative intent of the cumulation provision. In one of the earliest cases dealing with cumulation, cumulation was held to embrace the policy of redressing the "collective hammering effect" due to the imports of new sources of supply "after avenues of dumping already utilized [have] been closed by enforcement of the antidumping statute." *See City Lumber Co. v. United States,* 64 Cust.Ct. 826, 829–30, A.R.D. 269, 311 F.Supp. 340, 343 (1970), *aff'd,* 59 CCPA 89, C.A.D. 1045, 457 F.2d 991 (1972). In a more recent case, this Court noted that Congress elected to mandate cumulation in broad terms. *See Bingham & Taylor, Div. v. United States,* — CIT —, —, 627 F.Supp. 793, 797 (1986), *aff'd,* 815 F.2d 1482 (1986). As Congress specified that "cumulation is based on the sound principle of preventing material injury which comes about by virtue of several simultaneous unfair acts or practices," *see* H.R.Rep. No. 725, 98th Cong., 2d Sess. 37, *reprinted in* 1984 U.S.Code Cong. & Admin.News 4910, 5164, it is clear that Congress did not intend the ITC to focus on the procedural status of a "simultaneously unfair act or practice" on the date that a vote on material injury is rendered. The proper test under § 1677(7)(C)(iv) requires an evaluation of injury on a cumulative basis with the present investigation supplying the frame of reference for decision. *See Republic Steel Corp. v. United States,* 8 CIT 29, 34, 591 F.Supp. 640, 645 (1984) ("the proper test for cumulation is whether subsidized or allegedly subsidized imported products are competing with the product of a domestic industry during a period when the effect of these importations is being felt by the domestic industry"), *reconsideration denied,* 9 CIT 100 (1985), *rev'd on other grounds, American Lamb Co. v. United States,* 785 F.2d 994 (1986).

During the period 1982 through June, 1985, Polish structural shapes were subject to investigation by the ITC, pursuant to a petition filed simultaneously with the Norwegian petition. A preliminary determination regarding Polish structural shapes was rendered before the VRA was consummated and subsequent to the period investigated for dumping. The unfair margin of dumping for Polish structural shapes was high, nearly 60 percent. That Poland entered into an agreement to restrain imports after the period of investigation in no way diminishes or eliminates the debilitating and "collective hammering effect" of Polish imports on the domestic industry during the period of investigation, "a time when the effect of these importations [was] being felt by the domestic industry." *Republic Steel,* 8 CIT at 34, 591 F.Supp. at 645. As the Court recognized in *Bingham & Taylor, Div.,* — CIT at —, 627 F.Supp. at 798, "Congress clearly tipped the scale in favor of the domestic industry and against any country engaging in unfair trade practices." The defendant's and the defendant-intervenor's attempt to impose a rigid and literal interpretation on the cumulation provision seeks to elevate form over substance and is in clear contravention of the legislative intent.

The defendant and defendant-intervenor argue, however, that in the absence of a final ITA determination of dumping by Poland, there is no foundation for the conclusion that Poland has contributed to injury. In their view, Title VII "is a remedy targeted at a specific type of injury caused by unfair import competition," and that therefore, "[a]bsent a finding to the contrary, the Commission presumes imports to be fairly traded." Defendant's Memorandum in Response to Plaintiff's Motion for Judgment on the Agency Record at 42 n. 94, *Chaparral Steel Co. v. United States,* (No. 85-12-01767) (citing H.R.Rep. No. 317, 96th Cong., 1st Sess. 46 (1979)). While a pre-

sumption of fairness may be entitled to the imports of a particular country, the Court finds that the absence of a final determination of dumping is not dispositive of the issue whether cumulation is appropriate. The existence of a preliminary determination of dumping and conversely, the absence of a final determination, affects the weight and credibility of the evidence presented, not its overall relevance. A preliminary finding of dumping is less than perfect information; however, such a finding is the only information in existence. Furthermore, although Title VII presumes imports to be fairly traded, a finding of dumping, albeit one that is preliminary, is sufficient to overcome that presumption and render those imports potential candidates for cumulation.

The defendant further urges that the withdrawal of a petition for import relief restores the situation to the *status quo ante*. In other words, the defendant argues, when Chaparral withdrew its petition for relief against Polish structural shapes, it was as if the investigation had never occurred. The defendant attempts to draw a parallel between withdrawal of a petition and a dismissal without prejudice under Rule 41(a)(1) of the Federal Rules of Civil Procedure. Under Rule 41(a)(1), continues the defendant, the dismissal leaves the matter in the same situation as if the action had never been filed. In a dismissal "without prejudice under Rule 41(a)(1)," however, no preliminary findings or official rulings could have been made prior to the withdrawal of a complaint without resultant prejudice. In the case at bar, there is no dispute that the ITC made a determination, albeit one that was preliminary, of dumping by Polish structural shapes. The existence of the VRA and the withdrawal of a petition do not alter the fact that Polish imports were preliminarily found to have been dumped on the domestic market. Further, the VRA merely affords prospective relief. Its existence does not *ab initio* deny the effect of unfairly traded imports before that time.

There is no dispute that in withdrawing its petition for import relief against imports from Poland that Chaparral acted

voluntarily but in compliance with the VRA. Chaparral, however, conditioned withdrawal of its petition against Poland in a letter of understanding to the Commerce Department. In this letter, Chaparral expressed entitlement "to construe the Arrangement as the functional equivalent of a suspension of an investigation where there is agreement on the part of the exporters to eliminate the injurious effect of sales at less than fair value as provided in Section 734(c) of the 1979 Trade Agreement Act." Chaparral's Reply, *supra*, at Annex C, pp. 1–2. The ITC should not now be permitted to argue that Chaparral should be prejudiced by the withdrawal of the petition.

Finally, policy considerations support the finding that withdrawal of a petition pursuant to a VRA should not be determinative of the issue of cumulation. The relevant inquiry focuses on an evaluation of the simultaneous unfair acts or practices that have a "collective hammering" effect on the domestic industry during the investigatory period. If withdrawal of a petition jeopardizes the possibility of cumulation with like and competing imports from other countries, then the incentive to cooperate in a bilateral trade agreement would be greatly reduced. Similarly, if the imported products of a particular country will not be subject to cumulation due to the conclusion of a VRA with other countries, then that country will receive a windfall through continued dumping for failing to conclude a VRA.

The plaintiffs also contend that the ITC incorrectly concluded that the antidumping duty investigation of Spanish steel was terminated by the withdrawal of a petition pursuant to a VRA prior to any final determination of dumping. In their view, this antidumping proceeding *in fact* culminated in a final affirmative ITA determination of dumping in December, 1984. *See* 49 Fed.Reg. 48582 (Dec. 13, 1984). Therefore, they urge, the ITC made a mistake in fact and thus erred in rejecting cumulation on that ground. The defendant and the defendant-intervenor do not address this allegation of error. They simply

maintain that in the absence of a final determination of dumping, there can be no presumption of unfair trade under Title VII. They further urge that since the antidumping duty investigation of Spanish steel was terminated prior to the date of the final determination regarding Norwegian steel, these imports were not longer "subject to investigation" at the relevant time, and that therefore cumulation was not warranted.

As previously stated, the domestic industry commenced an antidumping proceeding against Spanish structural shapes in February, 1984. This investigation, as established by the record presented for review in this case and contrary to the assertions of the defendant and defendant-intervenor, resulted in a *final* affirmative determination. In fact, this final determination was rendered in December 1984, at a time coinciding with the investigatory period of injury due to Norwegian structural shapes. Thus, the defendant's concern that the statutory purpose underlying Title VII would not be served by factoring presumptively fairly traded imports into the cumulation assessment is unfounded.

Furthermore, although the Spanish antidumping investigation was terminated in January, 1985, *see* 50 Fed.Reg. 3949 (Jan. 29, 1985), dumped Spanish structural shapes were present in the market and "subject to investigation" for virtually the entire period of investigation of Norwegian structural shapes. It is this period that supplies the relevant frame of reference for the term "subject to investigation." The mere fact that the Spanish antidumping investigation was terminated prior to "vote day," the day the final determination was rendered in the Norway investigation, is *not* determinative of the issue of cumulation. Congress intended to prevent material injury which comes about by virtue of several simultaneous unfair acts or practices. H.R.Rep. No. 725, 98th Cong.2d Sess. 37, *reprinted in* 1984 U.S.Code Cong. & Admin.News 4910, 5164. The remedy was intended to reach those imports at a time when the effect of these imports are felt by the domestic industry. *See Republic Steel Corp.*, 8 CIT at 34, 591 F.Supp. at 645.

Thus, the relevant inquiry is whether unfairly traded imports are present in the market and subject to investigation during the period of investigation concerning material injury to the domestic industry. There can be no question that Spanish structural shapes were present in the domestic market and subject to investigation during a good portion of the period investigated for material injury by the Norwegian structural shapes.

■ Plaintiffs also challenge the ITC's rejection of cumulation of certain subsidized imports of the like product from Spain and South Africa which were subject to countervailing duty orders. They challenge the conclusion that these imports were not "reasonably coincident" in time with the imports from Norway and that these countervailing duty orders were remote in time. In defending the determination, both the defendant and defendant-intervenor contend that since these orders became effective in 1982 for South Africa, *see* 47 Fed.Reg. 39379 (Sept. 7, 1982), and 1983 for Spain, *see* 50 Fed.Reg. 51 (Jan. 3, 1983), the imports were not "subject to investigation" in a period reasonably coincident with the Norwegian structurals which did not enter the United States until one year after these orders became effective. In fact, they continue, the countervailing duty orders covering Spanish and South African structural shapes were revoked effective October 1, 1984, three-quarters of the way through the first year of measurable imports from Norway.

Of central concern to the Court is the allegation by the defendant and the defendant-intervenor that § 1677(7)(C)(iv) requires, in addition to the stated criteria, that the imports be reasonably coincident with the imports under investigation. This requirement, they urge, stems from the following language contained in the Conference Report accompanying the Trade Act:

The provision requires cumulation of imports from various countries that each account individually for a small percentage of total market penetration but when

combined may cause material injury. The conferees do intend, however, that *the marketing of imports that are accumulated [sic] be reasonably coincident.* H.R.Rep. No. 1156, 98th Cong., 2d Sess. 173, *reprinted in* 1984 U.S.Code Cong. & Admin.News 5220, 5290 (emphasis added). In their view, this language suggests the existence of a third factor in the cumulation assessment of § 1677(7)(C)(iv).

While this Court must give substantial weight to a reasonable agency interpretation, *American Lamb Co. v. United States,* 785 F.2d 994, 1001 (1986) (citing *Zenith Radio Corp. v. United States,* 437 U.S. 443, 450–51, 98 S.Ct. 2441, 2445–46, 57 L.Ed.2d 337 (1978); *Udall v. Tallman,* 380 U.S. 1, 16, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1965), *reh'g denied,* 380 U.S. 989, 85 S.Ct. 1325, 14 L.Ed.2d 283 (1965)), no deference is entitled to a plainly erroneous legal interpretation. The Court finds that neither the language of the statute nor its legislative history support the contention that Congress intended "reasonable coincidence" to operate as a separate, discrete requirement for cumulation.

Language requiring that the imports to be cumulated be reasonably coincident was contained in the original House bill. *See* H.R. 4784, 98th Cong., 2d Sess. § 105(a)(2), 130 Cong.Rec. 7948–49 (1984). This language, however, was not contained in the House Committee on Ways and Means version of the cumulation provision. *See* H.R. Rep. No. 725, 98th Cong., 2d Sess. 37, *reprinted in* 1984 U.S.Code Cong. & Admin.News 5127. While this language reappeared in the Senate version of the House bill, the amended House version was adopted in Conference. *See* H.R.Rep. No. 1156, 98th Cong., 2d Sess. 173, *reprinted in part in* 1984 U.S.Code Cong. & Admin. News 4910, 5220. Thus, while Congress contemplated a third requirement that the marketing of imports be reasonably coincident, reasonable coincidence as a distinct requirement for cumulation was rejected.

The Conference Report from which this alleged requirement derives provides that "the *marketing* of imports that are accumulated [sic] be reasonably coincident."

This language is more plausibly construed as an explanation of the statutory requirement that the imports *compete* with the like products of the domestic industry in the United States market. If the marketing of imports is not reasonably coincident with the imports under investigation, then the likely inference is that the imports do not compete with each other and are not joint contributors of the "collective hammering" effect cumulation is intended to redress. Thus, the pertinent language of the Conference Report cannot be construed as evidence of a third factor for consideration but must be considered an explication of one of the statutory factors in the cumulation assessment.

The defendant also argues that the imports from Spain and South Africa subject to countervailing duty orders were not subject to investigation in a period simultaneous with those from Norway or even in a period reasonably coincident with the investigation of Norwegian structural shapes, which did not enter the United States in measurable amounts until one year after the countervailing duty orders were issued. They further urge the orders were too remote in time to warrant cumulation.

Citing language contained in a *summary* of the cumulation provision in the House Committee Report accompanying the Trade Act, the defendant contends Congress intended the cumulation of like imports from two or more countries subject to *simultaneous* investigation. *See* Defendant's Memorandum, *supra,* at 44 n. 98 (citing H.R.Rep. No. 725, 98th Cong., 2d Sess. 8, *reprinted in* 1984 U.S.Code Cong. & Admin.News 4910, 5127, 5134). Although the summary provides that cumulation is mandatory for countries subject to "simultaneous investigation," simultaneous is more properly understood as modifying the term unfair act or practice. *See* H.R.Rep. No. 725, 98th Cong., 2d Sess. 37, *reprinted in* 1984 U.S.Code Cong. & Admin.News 4910, 5127, 5164. *See also Bingham & Taylor, Div.,* 815 CIT at 1485, 627 F.Supp. at 796; *Bingham & Taylor, Div.,* 815 F.2d at 1485. Further, while Congress mandated cumulation of imports subject to investigation, im-

ports are undoubtedly "subject to investigation" within the meaning of 19 U.S.C. § 1677(7)(C)(iv) when like imports from several countries enter the United States at the same time, are beneficiaries of unfair acts or practices, and when the domestic industry files petitions simultaneously.

The legislative history also establishes that the marketing of imports, not the *investigations* be reasonably coincident in time. There can be no dispute that imports from Spain and South Africa were present in the market for virtually the entire period of investigation of Norwegian structurals. When, in 1984, measurable imports from Norway were first recorded, like imports from Spain and South Africa were present and marketed in the United States. The marketing of these imports was therefore reasonably coincident. Thus these imports competed with the imports from Norway and were relevant to the cumulation inquiry.

It is not relevant, however, that both the Spanish and South African steel investigations culminated in countervailing duty orders prior to the date on which a final determination was rendered in the Norwegian investigation.[2] A finding of reasonable coincidence in the marketing of imports is not precluded by the issuance of a countervailing duty order. Further, the remoteness in time of an order is not determinative under the cumulation provision. For example, in the present case, subsidy findings pertaining to Spain and South Africa were still in effect during most of the period of investigation of Norwegian structurals. As the ITC found in regard to South Africa, subsidies in the form of assumptions of finance charges by the South African government would apply through 1992. 47 Fed.Reg. 39379, 39380 (Sept. 7, 1982). With regard to Spain, the ITC determined that subsidies in the form of three infusions of capital in excess of losses would

apply through 1992, 1994, and 1995. The ITC also found subsidies in the form of preferential loans and loan guarantees granted during 1977 through 1981. Presumably, some portion of these subsidies once allocated over the term of the loans would apply through 1986, if not later. 47 Fed.Reg. 51438, 51440–43, 51451–52 (Nov. 15, 1982).

The cumulation of imports subject to antidumping or countervailing duty orders would also appear to be supported by at least one memorandum of the ITC General Counsel, the pertinent provisions of which provide as follows:

We are of the opinion that the term "subject to investigation," as used in the statute, encompasses both imports which are alleged to be unfairly traded and imports subject to a finding that they are unfairly traded. We believe that Congress intended that the Commission cumulatively analyze the volume and effect of both imports subject to a final antidumping or countervailing duty order entered within a reasonable time of entry into the United States market of the imports under investigation, and imports currently under investigation. Limiting the availability of a cumulative analysis to imports being investigated concurrently would require, in effect, that the domestic industry file all petitions involving a particular product at the same time. Moreover, the effect of unfairly traded imports on the domestic industry and on the United States market does not dissipate immediately upon entry of an antidumping or countervailing duty order. Thus, the collective adverse effect of unfairly traded imports on the domestic industry, which is the basic rationale for a cumulative analysis, continues for some period of time after an antidumping or countervailing duty order is entered. We are of the opinion that the Commission should base its decision whether to

---

**2.** It is interesting to note that a Senate provision that would have required cumulation of imports from countries subject to final orders as well as from countries under investigation was rejected in favor of the House language that the imports to be cumulated be "subject to investigation." *See* H.R.Rep. No. 1156, 98th Cong., 2d Sess. 173, *reprinted in* 1984 U.S.Code Cong. & Admin. News 4910, 5290. This would tend to support the view that Congress has "removed the limitation regarding final orders contained in the Senate version of the provision." *See* USITC General Counsel Memorandum GC–H–060 (April 1985).

cumulate imports subject to an outstanding antidumping or countervailing duty order with imports currently being investigated on the particular facts of each case, taking into consideration the length of time the order has been in effect and its effect on conditions in the domestic industry.

Administrative Record, Doc. 77 at 9–10, *United States Steel Corp. v. United States* (Court No. 85–03–00384) (footnote omitted). Since the ITC concedes that the effect of unfairly traded imports on the domestic industry does not dissipate immediately upon entry of an antidumping or countervailing duty order, and since the ITC found the subsidies in question would continue throughout the period of the Norway investigation, it was error for the ITC to refuse to cumulatively assess the volume and price effects of the imports from Spain and South Africa.

The defendant also argues that the ITC properly decided that it is inappropriate to cumulate across countervailing duty and antidumping investigations. Although the defendant fully briefed the issue of cross-cumulation, this issue has since been decided by the United States Court of Appeals for the Federal Circuit. *See Bingham & Taylor, Div. v. United States,* — CIT ——, 627 F.Supp. 793 (1986), *aff'd,* 815 F.2d 1482 (1986). While it is not necessary to address each argument made by the defendant on the issue of cross-cumulation, it is instructive to discuss some of the salient points made by this Court and the Federal Circuit in the *Bingham & Taylor* decision.

*Bingham & Taylor* involved a challenge of a preliminary negative determination of injury to the domestic light iron construction casting industry by reason of subsidized imports from Brazil. The plaintiffs challenged the ITC's decision not to cumulate with the imports from Brazil, the volume and price effects of like imports from Canada, India, and the People's Republic of China subject to simultaneously initiated antidumping investigations. This Court held that cross-cumulation of the volume and price effects of imports subject to antidumping and imports of like products sub-

ject to countervailing duty investigations was required.

In affirming the decision of this Court in *Bingham & Taylor,* the Federal Circuit referred to legislative history that cumulation was designed "to eliminate the inconsistencies in the Commission practice and to ensure that the injury test adequately addresses simultaneous unfair imports from different countries." 815 F.2d at 1485 (citing H.R.Rep. No. 725, 98th Cong., 2d Sess. 37, *reprinted in* 1984 U.S.Code Cong. & Admin.News 4910, 5127, 5164. Concluding that "whether imports are dumped, subsidized, or both does not alter their status as unfair imports," and that Congress mandated cumulation in broad terms, the Federal Circuit ruled that cross-cumulation was required. 815 F.2d at 1486. Because *Bingham & Taylor* requires cross-cumulation in appropriate circumstances, the Court finds the ITC erroneously based its decision not to consider the subsidized imports from Spain and South Africa on the conclusion that cross-cumulation is not required.

## CONCLUSION

For the reasons stated above, the Court holds the ITC erroneously determined not to cumulatively assess the volume and price effects of certain allegedly dumped imports from Poland with the like imports from Norway. The term "subject to investigation" must be interpreted by reference to the timeframe involved in the injury investigation. Since Polish imports were present in the market and "subject to investigation" during the entire period of investigation of injury by Norwegian structural shapes, the ITC erroneously concluded that Polish imports did not warrant cumulative analysis. Although Polish imports had been subject only to a preliminary determination of dumping, the absence of a final determination is not dispositive but merely affects the weight and credibility of the evidence and not its overall relevance.

With regard to the dumped Spanish imports, the ITC erroneously concluded that a final determination of dumping had not

**266**

been rendered. The ITC therefore erred in rejecting cumulation on this ground. Since dumped Spanish imports were present in the market and "subject to investigation" for virtually the entire period of the investigation of injury of Norwegian structural shapes, it was also error to conclude that cumulation of Spanish structural shapes subject to a finding of dumping was not warranted.

Finally, the Court holds that Spanish and South African structural shapes subject to countervailing duty orders were present in the market and subject to investigation during the timeframe of the investigation of injury by the Norwegian structural shapes. The mandatory cumulation provision does not require that the investigations be reasonably coincident or that the investigations be simultaneous. Reasonable coincidence refers to the requirement that the imports compete with each other and the like products of the United States as provided at § 1677(7)C)(iv). The term "simultaneous" refers to the legislative intent to redress material injury brought about by several simultaneous unfair acts or practices. *See* H.R.Rep. No. 725, 98th Cong., 2d Sess. 37, *reprinted in* 1984 U.S. Code Cong. & Admin.News 4910, 5164. Since the Federal Circuit has ruled that § 1677(7)(C)(iv) requires cumulation across antidumping and countervailing duty investigations, the ITC's refusal to cumulatively assess the volume and price effects of imports from Spain and South Africa subject to countervailing duty orders was erroneous.

### ORDER

Upon plaintiffs' motion for review of the final negative injury determination by the United States International Trade Commission (ITC) in *Carbon Steel Structural Shapes From Norway,* Inv. No. 731–TA–234 (Final), USITC Pub. No. 1785 (November, 1985), it is hereby

ORDERED that the Determination is remanded to the ITC; and

(1) The ITC is directed to cumulate the imports from Poland, Spain and South Africa with the imports of Norwegian structural steel shapes not inconsistent with the opinion issued simultaneously herewith; and

(2) Take such other administrative action the ITC deems appropriate not inconsistent with the opinion issued simultaneously herewith; and

(3) Report the results of such remand determination to this Court within 45 days from the date hereof.

So Ordered.