**MARSUDA–RODGERS INTERNATIONAL, Plaintiff,**

v.

**UNITED STATES; Robert A. Mosbacher, Secretary of Commerce; and U.S. International Trade Commission, Defendants,**

**The Timken Company, Defendant–Intervenor.**

**Court No. 87–07–00772.**

United States Court of International Trade.

July 26, 1989.

Stein Shostak Shostak & O'Hara, Robert Glenn White, Los Angeles, Cal., for plaintiff.

Stuart E. Schiffer, Acting Asst. Atty. Gen., David M. Cohen, Director, Commercial Litigation Branch, Civ.Div., U.S. Dept. of Justice, Velta A. Melnbrencis, of counsel: James A. Toupin, Asst. Gen. Counsel, and Phyllis N. Smithey, Atty., Office of the General Counsel, U.S. Intern. Trade Com'n, Washington, D.C., for defendants.

Stewart and Stewart, Eugene L. Stewart, Terence P. Stewart, Charles A. St. Charles, James R. Cannon, Jr. and Geert De Prest, Washington, D.C., of counsel: Scott A. Scherff, Sr. Corporate Counsel, The Timken Co., Canton, Ohio, for defendant-intervenor.

## OPINION

TSOUCALAS, Judge:

Plaintiff Marsuda–Rodgers International, a United States importer of tapered roller bearings (TRBs)[1] from Hungary, contests the United States International Trade Commission's (Commission) cumulation of imported TRBs from Hungary with those from Japan, Italy, the People's Republic of China (PRC), Romania, and Yugoslavia. *See Tapered Roller Bearings and Parts Thereof, and Certain Housings Incorporating Tapered Rollers From Hungary, the People's Republic of China, and Romania,* Inv. Nos. 731–TA–341, 344, and 345 (Final), USITC Pub. 1983 (June 1987).[2]

---

**1.** Tapered roller bearings are steel components used in machinery to counteract friction. When inserted between moving and stationary parts of machinery, the TRBs transmit the force generated by motion in the machinery from the moving parts to the stationary support.

**2.** Two members of the Commission dissented from the decision of the Commission majority that the imports from the investigated Communist countries warranted cumulation. Therefore, the Commission minority concluded that the domestic tapered roller bearing industry is not materially injured, or threatened with material injury, by reason of less than fair value imports of TRBs from those countries.

The final determinations of the Commission for Yugoslavia, Italy, and Japan are found in Inv. Nos. 731–TA–342 and 346 (Final), USITC

Plaintiff contends that the Commission erroneously used the cumulation methodology because the low quality Hungarian TRBs do not compete with high quality Japanese, Italian, and domestic TRBs within the meaning of the cumulation statute, 19 U.S.C. § 1677(7)(C)(iv) (1984 & Supp. V 1987).

The two main issues in contention are as follows: (1) whether the criteria the Commission used to make a finding of competition are reasonable, and (2) whether substantial evidence in the record supports the Commission's finding of competition. For reasons set forth below, the Court finds that the competition factors that the Commission applied in this case are not reasonable because there is insufficient evidence of a reasonable overlap in sales between low quality imported TRBs from Hungary and domestic like products. Therefore, the Court reverses the Commission's cumulation under the facts of this case and remands this action.

### Background

On August 25, 1986, The Timken Company, the defendant-intervenor, filed a petition with the International Trade Administration of the United States Department of Commerce (ITA) and with the Commission alleging that the United States industry is materially injured, or is threatened with material injury, by reason of less than fair value (LTFV) sales of TRBs from Hungary, the PRC, Romania, Yugoslavia, Italy, and Japan. 51 Fed.Reg. 31,732 (Sept. 4, 1986). Upon investigation, ITA made six separate final determinations, concluding that TRBs from all six countries listed in the petition are sold in the United States at LTFV.[3]

Pub. 1999 (Aug. 1987), and Inv. No. 731–TA–343 (Final), USITC Pub. 2020 (Sept. 1987).

3. The ITA published the following weighted-average dumping margins for the investigated countries:

| Hungary | 7.42% | PRC | .97% |
|---|---|---|---|
| Romania | 8.70% | Italy | 124.75% |
| Yugoslavia | 33.61% | Japan | 47.05% to 70.44% |

See 52 Fed.Reg. 23,319 (June 19, 1987); 52 Fed. Reg. 22,667 (June 15, 1987); 52 Fed.Reg. 23,320 (June 19, 1987); 52 Fed.Reg. 30,417 (Aug. 14, 1987); 52 Fed.Reg. 30,700, 30,709 (Aug. 17, 1987).

The Commission also found material injury to the domestic industry by reason of unfairly traded imports, pursuant to 19 U.S.C. § 1673d(b)(1) (1982).

In making this material injury determination, the Commission used the cumulation methodology, pursuant to 19 U.S.C. § 1677(7)(C)(iv). In general, the Commission makes its material injury determination by evaluating unfairly traded imports from a single foreign country source at a time. When sources of LTFV imports of products subject to investigation exist in more than one country, the cumulation statute mandates the Commission to cumulatively assess the injury data, i.e., the volume of the import, its effect on prices for like products in the United States, and its impact on the affected domestic industry, in certain circumstances. The cumulation statute reads as follows:

(iv) Cumulation

For purposes of [making injury determinations], the Commission shall cumulatively assess the volume and effect of imports from two or more countries of like products subject to investigation *if such imports compete with each other and with like products of the domestic industry in the United States market.* (Emphasis supplied).

*Id.* Under this provision, the subject imports which allegedly injure the domestic industry must (1) compete with other imports and with the domestic like products; and (2) be subject to investigation.[4] The Commission determined that the statutory requirements for cumulation of imported TRBs were satisfied for all six countries under investigation.

4. The Commission has interpreted this provision to additionally require that the subject imports must be marketed within a reasonably coincident time period.

For a discussion of "subject to investigation," see *Bingham & Taylor Div., Virginia Industries, Inc. v. United States,* 815 F.2d 1482 (Fed.Cir. 1987); *Chaparral Steel Co. v. United States,* 12 CIT ——, 698 F.Supp. 254 (1988), *appeal docketed,* Nos. 89–1338 and 1339 (Fed.Cir. Mar. 14, 1989).

During the administrative proceedings in the instant case, plaintiff argued that the gap in quality between the Hungarian TRBs on one hand, and the domestic, Japanese, and Italian TRBs, on the other, is so marked that the requisite competition is not present to cumulate. Plaintiff maintained that this quality difference effectively makes the low quality. TRBs a distinct product with a discrete position in the tapered roller bearing market.

The Commission acknowledged the disparity in quality between Hungarian, Chinese, Romanian, and Yugoslavian TRBs, and their domestic, Japanese, and Italian counterparts, but ruled that such difference does not preclude competition for purposes of cumulation. Certain facts are undisputed in this regard. The TRBs manufactured in the Communist countries are more brittle and less friction-absorbing and have less life expectancy and less precise geometries than the TRBs made in Japan, Italy, and United States. *See* USITC Pub. 1983 at 13–14. The U.S. sales of imports from the Communist countries are thus restricted to those segments of the tapered roller bearing market, namely, certain non-driving axles (utility trailers and mobile homes), conveyors, and the aftermarket for replacement use, in which the machine parts neither generate a great amount of friction nor require precision. *Id.* Conversely, the high quality Japanese, Italian, and domestic TRBs serve machinery which necessitate resilient TRBs made with highly precise measurements. These machinery include motor vehicles and related equipment, miscellaneous industrial and agricultural machinery, truck-trailer, railroad and construction equipment, and the aftermarket for replacement use. *Id.* at A–20– A–22. Notwithstanding this quality difference, and the resulting market segmentation, the Commission reasoned that cumulation of qualitatively inferior Hungarian,

Chinese, Romanian, and Yugoslavian TRBs with qualitatively superior Japanese and Italian TRBs is proper because there is competition between them in the low end, less-demanding segments of the market.

### Discussion

#### A. Competition Standard

##### 1. Conceptual Framework

In determining whether the multiple-sourced imports "compete with each other and with like products of the domestic industry in the United States market," as provided in 19 U.S.C. § 1677(7)(C)(iv), the Commission's practice is to generally apply the following criteria:

(1) the degree of fungibility between imports from different countries and between imports and the domestic like product, including consideration of specific customer requirements and other quality-related questions;

(2) the presence of sales or offers to sell in the same geographic markets of imports from different countries and the domestic like product;

(3) the existence of common or similar channels of distribution of imports from different countries and the domestic like product;

(4) whether the imports are simultaneously present in the market.

The Commission does not consider any one of these factors to be outcome-determinative on the question of competition. Rather, the Commission accords varying weight to each of these elements in light of the unique facts of each investigation. Moreover, the Commission may consider factors other than those listed above if it is factually warranted.[5]

 Although the Commission failed to explicitly specify the factors it used in the competition inquiry, this failure does not,

---

**5.** *See Certain Brass Sheet and Strip From Brazil, Canada, and the Republic of Korea,* Inv. No. 701–TA–269 (Final), USITC Pub. 1930 (Dec. 1986) at 12–13; *see also Certain Carbon Steel Pipes and Tubes From the People's Republic of China, the Philippines, and Singapore,* Inv. Nos. 731–TA–292–296 (Preliminary), USITC Pub. 1796 (Dec.1985) at 10; *Certain Welded Carbon Steel Pipes and Tubes From India, Taiwan, Turkey, and Yugoslavia,* Inv. Nos. 701–TA–251–253 (Preliminary), USITC Pub. 1742 (Aug.1985) at 12, n. 28. In these latter two investigations, the Commission considered, in addition to those factors enumerated above, whether the prices of imports and the domestic like product are within a reasonable range.

by itself, invalidate the Commission's findings. The Commission's decision to cumulate is presumed to be correct, and the burden of proving otherwise rests on the plaintiff. *See* 28 U.S.C. § 2639(a)(1) (1982). Indeed, plaintiff does not attack the Commission's failure to specify the competition factors as a ground for reversal, apparently accepting defendants' averment that the Commission employed the four-part test in the instant investigation.

■ Rather, plaintiff's methodological challenge is that this test is not reasonable because it is conceptually analogous to the formula the Commission uses in "like product"[6] analysis. Plaintiff argues that to the extent the standard "competition" is applied to imports which already have been determined to be "like" a domestic product, competition factors must necessarily be more stringent than "like product" criteria. In "like product" analysis, which is made in accordance with 19 U.S.C. § 1677(4)(A) (1982 & Supp. V 1987) for purposes of defining the domestic industry, the Commission considers physical characteristics and uses, interchangeability, channels of distribution, and common manufacturing facilities and production of the product under investigation. Plaintiff asserts that when compared with these "like product" factors, only the first element of the competition test, that is, the issue of fungibility, narrows the scope of "like product" findings. Plaintiff contends that the Commission is required to focus more closely on the fungibility issue, particularly through an examination of the products' "acceptance by the same purchaser-consumers in the same segment of the market for the same uses." *Brief in Support of Plaintiff's Motion for Judgment Upon the Agency Record* at 9.

In this case, the Commission concluded that all TRBs constitute a single "like product," notwithstanding its finding that TRBs are not essentially fungible. "Owing to the wide range of sizes and uses, tapered roller bearings of all sizes and types are not interchangeable or substitutable." USITC Pub.1983 at 6. TRBs are designed and sized for specific applications. Sizes of TRBs vary from one-half inch in outside diameter to over 100 inches in outside diameter; and because TRBs are precision machine parts, acceptable variances in their dimensions are often measured in millionths of an inch. *Id.* at A–4. Industry standardization exists, but the part numbers do not indicate internal geometries and tolerances, thereby preventing even identically numbered TRBs, made by different manufacturers, from being completely interchangeable in their use and application. *Id.* at A–4–A–6.

The analytical distinction that plaintiff draws between the questions of "competition" and "like product" is legitimate and useful for the purpose of reviewing the final determinations of the Commission. Logically, Congress would not have imposed on the Commission the additional requirement of competition if Congress intended to make all "like" products under investigation subject to a cumulation analysis. Therefore, the competition inquiry must necessarily be more vigorous than the "like product" analysis.[7] Plaintiff's argument, however, is deficient insofar as it proposes treatment of the competition inquiry as a pure question of law. The Court agrees with defendants that an examination of the facts on which the Commission based its finding of competition is necessary for resolving whether the competition factors that the Commission used are reasonable, and hence more stringent than the "like product" criteria.

### 2. Reasonable Overlap Test

■ The applicable evidentiary standard for determining competition between products is whether there is a "reasonable overlap" in sales between imports, and between

---

6. A "like product" is a product that is "like, or in the absence of like, most similar in characteristics and uses with, the article subject to an investigation." 19 U.S.C. § 1677(10) (1982).

7. The competition test may be coextensive with "like product" analysis in the preliminary phase of antidumping duty investigations. *See American Grape Growers Alliance for Fair Trade v. United States,* 9 CIT 396, 615 F.Supp. 603 (1985).

imports and domestic product in certain segments of the market. *See Fundicao Tupy S.A. v. United States*, 12 CIT ——, 678 F.Supp. 898 (1988), *aff'd*, 859 F.2d 915 (Fed.Cir.1988) (affirming the determination of the Commission that a finding of competition is warranted because there was "reasonable overlap in the geographic and end-user markets in which the imports and the domestic like product [were] sold." *Certain Cast–Iron Pipe Fittings From Brazil, the Republic of Korea, and Taiwan*, Inv. Nos. 731–TA–278–280 (Final), USITC Pub. 1845 (May 1986) at 9); *see also Wieland Werke, AG v. United States*, 13 CIT ——, 718 F.Supp. 50 (1989); *Granges Metallverken AB v. United States*, 13 CIT ——, 716 F.Supp. 17 (1989). In *Fundicao Tupy*, which affirmed a Commission decision based upon consideration of the very same competition factors at issue here, the court concluded that finding of competition by the Commission was proper even as to inferior quality imports which were not sold in every segment of the market because "there was sufficient evidence of overlap in the end-use market." *Id.* at ——, 678 F.Supp. at 902. If there is substantial evidence on the record which satisfies the "reasonable overlap" test, then it could reasonably be inferred that the competition inquiry of the Commission is more vigorous than "like product" analysis. The remaining question is whether substantial evidence on the whole record supports the Commission's determination.

B. *Substantiality of Evidence*

1. Standard of Review

■ The Court is required to uphold a Commission's determination which is supported by substantial evidence on the record as a whole. 19 U.S.C. § 1516a(b)(1)(B) (1982). Substantial evidence is relevant evidence that a "reasonable mind might accept as adequate to support a conclusion." *Matsushita Elec. Indus. Co. v. United States*, 750 F.2d 927, 933 (Fed.Cir.1984) (citing *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S.Ct. 206, 216, 83 L.Ed. 126 (1938)). It is not within the Court's domain either to weigh the adequate quality or quantity of the evidence for sufficiency or to reject a finding on grounds of a differing interpretation of the record. *Matsushita*, 750 F.2d at 933 (citing *Consolo v. Federal Maritime Comm'n*, 383 U.S. 607, 619–20, 86 S.Ct. 1018, 1026, 16 L.Ed.2d 131 (1966)). It is not sufficient, however, to merely examine the evidence that sustains the Commission's conclusion. *Universal Camera Corp. v. NLRB* 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951). The Court must consider all evidence in the record, including evidence which may weigh against the Commission's decision. *Id.*

2. Record and Reasonable Overlap Test

Plaintiff alleges that the Commission erroneously included Hungarian imports in the cumulation analysis because the record lacks sufficient evidence to support a finding of competition as to the Hungarian product. As stated, the Commission decided that the cumulation of high quality imported TRBs from Japan and Italy with low quality imported TRBs from Hungary, the PRC, Romania, and Yugoslavia was warranted because low quality "imports are able to compete with domestic production . . . where extremely precise tolerance and longer life of the bearing are not as important." USITC Pub. 1983 at 14. The factual authority for the Commission's finding is replete with evidence of genuine gaps in quality between imported TRBs from the investigated Communist countries and domestic, Japanese, and Italian TRBs. The record lacks direct evidence of competition, however, between high and low quality TRBs in general, and between Hungarian and domestic TRBs in particular.

The record authority on which the Commission relied to support this finding of competition chiefly consists of a discussion of description, uses, and methods of manufacture of TRBs. *Id.* at A–4, A–6, and A–8–A–9. This authority explains the nature of quality difference between high and low quality TRBs, including corroborating statements to this effect by certain importers, purchasers, and U.S. producers. *Id.* at A–54–A–57. Further, this authority states

that, while few purchasers responded that Hungarian, Chinese, Romanian, Yugoslavian bearings are of the same quality, the results of laboratory tests confirm that qualitatively inferior TRBs from the investigated Communist countries cannot be sold for high-stress application. *Id.* at A–54.

The specific data which the Commission cited as being supportive of its determination consist of two tables showing market penetration of imports from the investigated countries. *See id.* at A–20 and A–22. The utility of these tables, however, for purposes of deciding that the Hungarian TRBs compete with the domestic like product, is diminished because they do not offer separate statistics for imports from Hungary. Rather, these tables present a share of the low end of the market by already combined imports from Hungary, the PRC, Romania, and Yugoslavia, effectively buttressing a finding of competition with premature cumulative analysis.[8]

■ Defendants' explanation of the Commission's premature cumulative analysis of injury data from the investigated Communist countries reveals a fundamental flaw in the Commission's competition inquiry. Defendants explain that separate market penetration statistics for each source-country were not required because "where cumulation is appropriate, volume is to be considered on a cumulated basis without regard to whether imports from one country are independently a cause of material injury." *Defendants' Memorandum in Opposition to Plaintiff's Motion for Judgment on the Agency Record of the U.S. International Trade Commission* at 40 (*Defendants' Memorandum*) (citing *USX Corp. v. United States*, 11 CIT ——, 655 F.Supp. 487 at 492–93 (1987); *USX Corp. v. United States*, 12 CIT ——, 682 F.Supp. 60 (1988)). The problem with defendants' position is that, in effect, defendants have circumvented the proper order of injury analysis: decision as to appropriateness of cumulation analysis is subse-

quent, and not prior, to an affirmative finding of competition. Under the cumulation statute, a separate competition inquiry with respect to each country under investigation is a condition precedent to subjecting imports therefrom to cumulation analysis. Any other reading of the statute, such as defendants suggest, renders meaningless the standard for "competition," since imports from a source country will be subjected to cumulation analysis without a finding whether they "compete with [imports from other source countries] and with like products of the domestic industry in the United States market." 19 U.S.C. § 1677(7)(C)(iv).

The evidence of overlap in sales that defendants proffer as justifying a finding of competition do not satisfy the "reasonable overlap" test. As stated above, there is no dispute that "the sales of [the low quality] bearings are restricted to the low-end, less-demanding segments of the tapered roller bearing market." USITC Pub. 1983 at A–54. It is also not challenged that low quality products are not produced domestically. Therefore, incidence of overlap in sales between high quality domestic TRBs and low quality imported TRBs consists of a few sales of Timken's products to customers whose needs could have been satisfied by cheaper lower quality TRBs. According to defendants, some purchasers "will pay a premium for Timken's bearings for various reasons. These include: (1) Timken's good customer relations and excellent reputation for quality product and a very extensive product line; (2) the fact that Timken's engineering services are in place; and (3) strong anti-import sentiment, particularly when the company has strong labor unions that have successfully refused to assemble imported bearings." *Defendants' Memorandum* at 35.

■ Under the circumstances, these occasional sales that Timken is able to make based on these non-price reasons do not meet the "reasonable overlap" test, despite defendants' contrary assertions.

---

**8.** Plaintiff further attacks the utility of these tables on the grounds that they do not show market penetration data for the Italian product. Since statistics for imported Italian TRBs were unavailable, the Commission was justified in adopting the "best information available" rule pursuant to 19 U.S.C. § 1677e(b) (1982 & Supp. IV 1986).

For purposes of satisfying this test, it is not sufficient to merely establish that few isolated sales go to the same customers who are financially endowed enough to purchase premium-priced goods when adequate cheaper goods are available. The "reasonable overlap" test requires a separate finding, based upon specific facts, as to whether these sales are "reasonable" to warrant a finding of competition. In other words, the "reasonable overlap" test necessarily incorporates value and volume of a minimal extent as an implied factor of competition. While cumulation does not require a finding that imports from each country, considered alone, caused material injury, it must, however, "sufficiently implicate the product of each country in the general pattern of activity which is causing injury." *Fundicao Tupy S.A. v. United States*, 12 CIT at ——, 678 F.Supp. at 902. Otherwise, an unfair situation may be created by elimination of specific causation finding with respect to unfairly traded imports from a single foreign country source at a time, that is, attributing injury to a source-country without adequate factual basis to that effect.

In this connection, the record reveals that loss of U.S. market share occurred in four types of markets, namely, auto and auto related, truck-trailer, material handling, and aftermarket, but that the four prematurely cumulated countries of Hungary, China, Romania, and Yugoslavia are not in the first three of those markets at all. *Administrative Record*, Confidential Document 33 at A–28 and A–31 (showing, in undeleted form, the two tables appearing in USITC Pub. 1983 at A–20 and A–22). Additionally, plaintiff did not import the sets of bearings which make up the aftermarket. *Id.* at A–34. Similarly significant is the evidence that "[f]rom 1983 to 1986, the U.S. producers' share of the tapered roller bearing market declined 9.4 points by quantity and 6.5 points by value.... During the same period, the share of the market accounted for by [unfairly traded TRBs from] Hungary, China, Romania and Yugoslavia collectively declined 0.1 percentage point by quantity (from 4.4 percent to 4.3 percent) and stayed exactly the same (1.1

percent) for the share of the market by value." USITC Pub. 1983 at A–52.

▮ In view of these facts, the present case is analogous to investigations in which the Commission declined to cumulate because the amount of overlap in sales was not "meaningful." For instance, the Commission concluded in one investigation that imports of certain carbon steel pipes and tubes from Canada, which are sold in an area isolated from where the sales of domestic goods take place, cannot be said to "meaningfully" compete, even if certain amount of overlap in sales occurs. *See Certain Carbon Steel Pipes and Tubes From the People's Republic of China, the Philippines, and Singapore*, USITC Pub. 1796 at 17.

Defendants' warning against scrutiny of specific injury data in resolving the question of "competition" highlights the dilemma surrounding the applicability of cumulation. Defendants' concern is that such factual scrutiny amounts to circular reasoning: that each country under investigation have a separate causal link to the material injury suffered by the domestic industry. It hardly needs recitation that at the cumulation stage, it is inappropriate to impose the requirement that each country under investigation exhibits a contributory injurious effect. *See, e.g., Fundicao Tupy S.A. v. United States*, 12 CIT at ——, 678 F.Supp. at 901. As stated, however, an examination of specific facts of each investigation is central to the competition inquiry. The Commission recognized this point, as demonstrated by the Commission's numerous reference to two tables showing prematurely cumulated market penetration statistics as being supportive of a finding of competition.

Competition, as defined by the Commission, is necessarily circumscribed at the outset of the analysis, precisely because it exists within the context of cumulation, where volume of imports plays a subordinate role, if at all. The general rule is that the Commission need not distinguish between imports of large and small magnitude in applying the cumulation statute. *See LMI–LA Metalli Industriale, S.p.A. v.*

*United States*, 13 CIT ——, 712 F.Supp. 959 (1989), *appeal docketed*, No. 89–1532 (Fed.Cir. June 16, 1989).[9] As stated, however, the "reasonable overlap" test effectively incorporated into itself the causation rationale: the "reasonable overlap" test constitutes a safeguard against potential overextension or abuse of cumulation which would lead to imputing injury without any evidentiary basis.

The purpose and goal of the statutory cumulation provision are compelling, and address the reality of modern day trade patterns, where dumping and subsequent injury to the domestic industry seldom manifest themselves as factors of a single country acting alone, but are rather the concerted result of simultaneous "cumulative" dumping of like products by several nations. *See* H.R.Rep. No. 725, 98th Cong., 2d Sess. 37, *reprinted in* 1984 U.S. Code Cong. & Admin.News 4910, 5164. But, inasmuch as injury causation cannot be a prerequisite for cumulation, individual causation cannot be imputed to each source-country under investigation because this necessarily leads to circular reasoning: justifying cumulation with affirmative injury determination. Therefore, to the extent protection of the domestic industry against what is a prevailing pattern of trade practices is a legitimate interest, the application of the cumulation provision must, as with the rest of the trade laws, be subjected to a balancing with equally compelling policy interests, namely, ensuring that in practice it does not evolve into an unduly restrictive trade measure. Similarly, while the Commission has wide latitude of discretionary authority in interpreting the standard "competition," this does not extend to applying such a low standard as to reduce it to a perfunctory exercise, thereby contravening the "reasonable overlap" test. Presently, the Court concludes that the Commission's finding that the Hungarian TRBs compete with domestic like products is not factually warranted because the "reasonable overlap" test is not satisfied.

*Conclusion*

For the foregoing reasons, the Court finds that the Commission's decision to cumulate the low quality Hungarian TRBs with high quality Japanese and Italian TRBs is without substantial evidence, and is not in accordance with the law. Therefore, the Court reverses the Commission's cumulative analysis and remands to the Commission to cumulate only those dumped TRBs which satisfy the "reasonable overlap" test. Since the unfairly traded Hungarian TRBs do not "compete" with their domestic counterparts, the Commission is directed to make traditional single country injury determination as to these imports. SO ORDERED.

---

**9.** Under the Omnibus Trade and Competitiveness Act of 1988, which applies to investigations initiated after August 23, 1988, the Commission is not required to cumulate imports which are found to be *de minimus*. Omnibus Trade and Competitiveness Act of 1988, Pub.L. 100–418, § 1330(b), 102 Stat. 1107, 1207 (1988).